Present:  All the Justices

LARRY BILL ELLIOTT
                                          OPINION BY
v.  Record Nos. 031610 & 031611  JUSTICE LAWRENCE L. KOONTZ, JR.
                                        March 5, 2004
COMMONWEALTH OF VIRGINIA

           FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                     William D. Hamblen, Judge


     In this appeal, we review the capital murder conviction and

death sentence imposed on Larry Bill Elliott for the murder of

Dana L. Thrall, Code § 18.2-31(7) (willful, deliberate, and

premeditated killing of more than one person as part of the same

act or transaction), along with his convictions for the first

degree murder of Robert A. Finch, Code § 18.2-32, and firearm

offenses related to these two murders, Code § 18.2-53.1.

                              BACKGROUND

     In accordance with well-established principles of appellate

review, we will recount the evidence as reflected in the record

in the light most favorable to the Commonwealth, the prevailing

party below.  Wolfe v. Commonwealth, 265 Va. 193, 198, 576

S.E.2d 471, 474, cert. denied, ___ U.S. ___, 124 S.Ct. 566

(2003).

                            The Murders

     At approximately 4:00 a.m. on the morning of January 2,

2001, Mary Bracewell, a newspaper delivery person, was traveling

her route in the Woodbridge community of Prince William County,

Virginia.  Bracewell was aware that there had been several recent vehicle break-ins in the neighborhood and became suspicious when she saw a man standing beside a pick-up truck parked on Belfry Lane.  Bracewell observed the man, who appeared to be carrying a flashlight, walk to the north end of Belfry Lane, cross the street, walk onto a grassy area between two townhouses, and then disappear from her view.  Bracewell called police on her cellular telephone to report her observations.

At 4:15 a.m., Officer Marshall T. Daniel of the Prince William County Police Department received a radio dispatch directing him to respond to Bracewell's call.  He arrived at Belfry Lane three minutes later.  Bracewell indicated the parked pick-up truck to Daniel and related to him what she had observed.  Daniel noted that the pick-up truck, which was locked, had a Department of Defense windshield identification sticker and that there was a cellular telephone on the passenger seat.

At 4:27 a.m., Officer Daniel received a radio call to respond to a report of a domestic disturbance at a townhouse located at 3406 Jousters Way.  Jousters Way is located approximately 300 yards north of Belfry Lane.  Although the two streets do not intersect, one can reach Jousters Way on foot

2

from Belfry Lane by walking in the same direction that Bracewell had seen the man beside the pick-up truck walking.

Tina Miller, who lived in an adjoining townhouse, had made the report of a domestic disturbance at 3406 Jousters Way. Miller telephoned police after being awakened by a crashing sound coming from 3406 Jousters Way at approximately 4:20 a.m. As she placed the call, Miller heard three or four "hollow" sounds followed by "the most horrible scream" she had ever heard. Miller thought that the screaming voice sounded like that of Thrall, one of the occupants of 3406 Jousters Way.

Tommy Young, who lived in a townhouse on the opposite side of the street from 3406 Jousters Way, was walking his dog in front of his home at about the same time Miller was awakened by the crashing sound. Young heard two loud "banging noises" coming from 3406 Jousters Way, followed by the sound of a female scream and three more banging noises. Young went back to his house and told his wife to call the police. A few minutes later, Young looked out his front window and saw that the front storm door of 3406 Jousters Way, which had earlier been closed, was swaying back and forth. Young also noted that the front window shades of the home, which were normally left half-drawn, were fully closed.

Officer Scott Bigger of the Prince William County Police Department arrived at 3406 Jousters Way at 4:25 a.m.  Officer Bigger knocked on the front door, but got no response.  Officer Daniel arrived a few minutes later and walked around to the back of the townhouse.  The backyard was enclosed by a privacy fence, and Officer Daniel could hear a large dog barking "pretty hysterical[ly], angry" inside the yard.

Returning to the front of the home, Officer Daniel observed that Officer Bigger had still received no response to his knocking on the front door.  Looking through a gap between the shades of a front window, Officer Daniel was able to see the legs of a person lying prone and motionless in the foyer of the home.  Officer Bigger opened the unlocked front door and he and Officer Daniel saw Finch, who lived with Thrall in the home, lying on the floor dead.  Finch had suffered three gunshot wounds:  one to his head, one to his back, and one to his chest.

Officer Daniel immediately returned to the back of the home to secure that area while Officer Bigger waited at the front of the home for additional officers to arrive.  When those officers arrived, Officer Daniel immediately returned to the location on Belfry Lane where the pick-up truck had been parked.  He arrived at that location at 4:38 a.m.  The truck was gone.

4

Officer Sheldon R. Creamer, one of the officers who had responded to the call by the other officers for assistance, arrived at 3406 Jousters Way at approximately 4:45 a.m. Entering the home, he heard "a muffled breathing sound" coming from the kitchen at the back of the home. In the kitchen he found Thrall, shot and lying in a pool of blood. Emergency medical personal called to the scene took Thrall by ambulance to a helicopter, which in turn evacuated her to the Washington Hospital Center in the District of Columbia, where she later died. Thrall had suffered multiple gunshot wounds including a defensive wound to her right hand, three to her head, and one to her chest. She also suffered a blunt force trauma to the back of her head consistent with a pistol-whipping.

Officer Creamer found that the backdoor was locked by its doorknob lock, but that the door's deadbolt lock was not engaged. He could hear the dog barking in the back yard. Entering the yard from the kitchen, Officer Creamer found that the dog had calmed down. He then determined that the gate of the privacy fence was secured with a locked padlock.

Meanwhile, because Officer Daniel had reported seeing a child looking out of a second floor back window, Officer Bigger reentered the home and went upstairs. There he found Thrall's

5

two sons, aged six and four, who were crying and upset.  Police officers removed the children from the home.

### The Investigation

Officer Thomas Leo, a crime scene analyst with the Prince William County Police Department, collected bloodstain samples at various locations inside the townhouse.  Subsequent DNA testing of these samples confirmed that the blood was that of Thrall and Finch.  Leo also found a bloodstain on the inside of the gate of the privacy fence.  Subsequent DNA testing of this sample showed that it was consistent with Elliott's DNA to a degree that a match would occur "once in the entire world population."

Although a murder weapon was never recovered, forensic testing of ten bullets recovered from the home and during the autopsies of Thrall and Finch confirmed that all had been fired by the same weapon.  The bullets were of a type used only in a revolver-type handgun.  Gary Arnsten, a firearms expert with Virginia's Division of Forensic Science, testified at trial that because no weapon of this type could hold more than five or six bullets in its revolving chamber, he was certain that the weapon had been reloaded during the commission of the murders.

Detective Charles Hoffman of the Prince William County Police Department spoke with Finch's sister, Jennifer Finch, the

day of the murders. She informed Detective Hoffman that Finch had a prior romantic relationship with Rebecca Gragg. She also told him that Finch and Gragg had been involved in a bitter custody dispute over their two children. Detective Hoffman went to Gragg's residence in Dale City, Virginia, located about six miles from the crime scene. Gragg was not at home, but there were two vehicles parked in front of the residence. One of the vehicles was registered in Elliott's name.

Gragg returned to her home later that day and was interviewed by two detectives. At that time, Gragg maintained that Elliott was her "friend and business partner." She denied knowing anything about the murders, but stated that Finch had many enemies.

The following day, January 3, 2001, Detective Hoffman and another detective traveled to Fort Meade in Hanover, Maryland, where Elliott worked as a civilian employee for the United States Army as a counterintelligence expert. The detectives had learned that Elliott owned a pick-up truck and wanted "to determine whether that truck could, in fact, have been the truck that was seen nearby the [crime] scene." The detectives located the truck in a parking lot at Fort Meade, and Detective Hoffman observed that there was a flashlight, a cellular telephone, and a box of bandages on the seat of the truck.

7

As Detective Hoffman was taking photographs of the truck, Elliott approached him, identified himself as the owner of the truck, and agreed to talk to the detectives. During that conversation, Elliott told the detectives that Gragg was an employee at a brewing company he owned in West Virginia. He admitted that he had supplied Gragg with a credit card in the name of "Rebecca L. Elliott," but maintained that this had been for business purposes. He also told the detectives that he had been traveling over the New Year's holiday, as had Gragg, and that during that time he had spoken with her several times on his cellular telephone in an effort to arrange a business meeting with her.

Elliott told the detectives that he was aware that Gragg and Finch were involved in a dispute regarding the custody of their two children. Elliott related that Gragg had traveled to Florida over the New Year's holiday and had taken the children with her. He further related that Gragg had told him that she was having car trouble and would not be able to return to Virginia with the children in time to return them to Finch at 2:00 p.m. on New Year's Day as she was required to do under a visitation agreement. Elliott claimed that he had driven to Gragg's residence in the early afternoon of New Year's Day "in case Robert Finch showed up so that [Elliott] could explain to

8

him the problems Rebecca was having with getting back." Elliott denied he had any relationship with Gragg other than as her employer. He also denied knowing Finch and claimed that he had seen him only once.

Although Detective Hoffman told Elliott that his truck had been seen in Finch's neighborhood in the early morning hours of the day of the murders, Elliott denied having been in the area. Elliott claimed that he had spent the night of January first to second sleeping in his truck at a rest area in Maryland.

Elliott voluntarily accompanied the detectives to the Anne Arundel County, Maryland Police Department. During the course of an interview there, Elliott admitted the true nature of his involvement with Gragg. He told the detectives that he had initiated a relationship with Gragg in mid-1999 after viewing her photograph on an Internet website called "Adult Friend Finders." In her advertisement, Gragg had indicated that she was looking for a "sugar daddy." During their first meeting, Gragg told Elliott that she had worked as a stripper and "private escort," a euphemism for a "call-girl" prostitute. Gragg told Elliott that she wanted to turn her life around and needed financial support to start a business designing and selling costumes for strippers. She told Elliott that she was not interested in having a romantic or sexual relationship with

9

him.  Elliott agreed to this arrangement, saying that he wanted only friendship from Gragg.

Elliott subsequently provided Gragg with significant financial support, including paying private school tuition for her children, paying the mortgage on one house Gragg owned in West Virginia and rental on others where she lived with her husband and children at various times, providing her with cars, and permitting her to use his credit cards.  Elliott also paid for breast augmentation surgery for Gragg, who had begun operating a pay-to-view pornographic website.  Elliott admitted that his support of Gragg had placed a significant financial burden on him and that he had to sell investments to pay her credit card debts.

Elliott further admitted that he knew where Finch lived and that, after he had gone to Gragg's house on the afternoon of January 1, 2001, he had driven to Finch's house.  He denied getting out of his truck, however, and claimed that he had seen "a black man with a slinky walk going to the front door of the home."  Elliott maintained that he had then driven to a large national retail store and a restaurant before driving to the rest stop in Maryland where he had spent the night.  He then claimed that he had driven back to Gragg's residence about 3:00 a.m. on the morning of January 2, 2001, to retrieve a case of

10

motor oil that he had seen there the day before.  He then went to a convenience store where he called Gragg's cellular telephone on a pay telephone.  Elliott claimed that he used the pay telephone because his own cellular telephone's battery had run down.  Telephone company records showed that a call had been placed from the pay telephone to Gragg's cellular telephone at 3:28 a.m. on January 2, 2001.

Elliott admitted that after calling Gragg, he drove to Finch's neighborhood.  He admitted leaving his truck, claiming that he did so only because he needed to urinate.  Elliott stated that after urinating by a guardrail on the side of the road, he walked by Thrall's and Finch's townhouse.  He denied going onto the property and stated that he had not heard gunshots, a scream, or anything unusual.  At the conclusion of this interview, Detective Hoffman took a photograph of an abrasion he had noticed on one of Elliott's hands.

On January 4, 2001, Gragg, accompanied by her lawyer, was again interviewed by detectives investigating the murders of Thrall and Finch.  During that interview, she admitted receiving a telephone call early on the morning of the murders, but claimed that the call had come from Finch.  Gragg claimed that Finch had threatened to call the police if she did not return their children to him that afternoon.  Gragg also told the

11

detectives that she did not believe that Elliott had committed the murders.

On January 7, 2001, Detective Hoffman conducted another interview with Elliott during which Elliott admitted that he had been in Finch's neighborhood "hundreds of times." He further admitted walking through the neighborhood, but again denied that he had ever been on the property of the townhouse where Thrall and Finch lived.

On January 8, 2001, Officer Leo, the crime scene analyst, took possession of Elliott's pick-up truck pursuant to a search warrant. He determined that the interior of the truck had recently been cleaned, noting that the carpet was wet and that the seats and interior had been covered with a "silicone type base cleaner." Nonetheless, testing of samples collected from the underside of the truck's floor mats showed a trace residue of blood, though the samples were too small for accurate DNA testing. A further blood sample found in the seat cushion was consistent with Elliott's DNA.

Detectives investigating the murders interviewed Gragg on January 12, 2001 and again on January 19, 2001. She continued to deny any knowledge of the murders. Based on the results of a polygraph examination that Gragg had agreed to take, police suspected that Gragg was not being fully forthcoming, but they

were not certain to what extent she had knowledge of the murders or whether she may have been directly involved. Over the next several months, Gragg had continuing contact with the police concerning the investigation of the murders, but she did not provide any additional information concerning Elliott.

On May 9, 2001, Elliott was arrested in Maryland and charged with capital murder. At that time, according to Maryland State Police, Elliott was "leaving [in his vehicle] at a high rate of speed," and there was some concern that he was attempting to flee. Elliott claimed, however, that he had intended to turn himself in.

On May 10, 2001, Prince William County detectives again interviewed Gragg. During that interview, Gragg agreed to submit to a second polygraph examination. After the polygraph examiner and Detective Hoffman told Gragg that her responses to questions concerning her knowledge of the murders indicated that she was being untruthful, Gragg asked to speak with her attorney.

After consulting with her attorney, Gragg told the police that the telephone call she had received early on the morning of the murders was not from Finch, although initially she had assumed it was because the connection was not good and she could not hear the caller clearly. Gragg then related that when the

13

caller realized that she thought she was talking to Finch, the caller said he was "tired of this s*** and was going to take care of it" and hung up. Gragg then realized that the call had come from Elliott. She attempted to call his cellular telephone, but the call was answered by a voice mail system.

Gragg told the detectives that she received several more calls on her cellular telephone from Elliott later on January 2, 2001. During one call, Elliott told her that "all of our problems had been taken care of." In another call, Elliott claimed that "Jerry," a cryptic figure Elliott supposedly knew through his work with military counterintelligence, "had come out of nowhere to help him, that he had to go clean up this mess." Later, Elliott told Gragg that he was looking for a place "to dump . . . these bloodied black trash bags from the mess that Jerry had made."

Gragg told the police that she had not been truthful in her prior interviews because she was afraid of Elliott and "Jerry," because Elliott had once told her that "Jerry" was watching her and that he would kill her or her family if she went to the police. Once Elliott was in custody and the police had assured her that there was no "Jerry," she stated that she had decided to be truthful. Gragg's attorney confirmed that she had told

14

him on several occasions that she feared Elliott would harm her if she told the police what she knew.

## Indictment and Pre-trial Proceedings

On August 6, 2001, the Prince William County grand jury returned indictments charging Elliott with the capital murder of Thrall, the first degree murder of Finch, and two counts of the use of a firearm in the commission of a felony. Elliott was tried on these indictments initially in a jury trial in July 2002. After the jury had found Elliott guilty and sentenced him to death, the trial court declared a mistrial after it had been determined that a juror had improperly discussed the case with a third party during the trial.

Prior to the July 2002 trial, Elliott had filed numerous motions, among which were motions to have the Virginia capital murder and death penalty statutes declared unconstitutional and to have the jury instructed that, if the Commonwealth presented evidence of vileness during the penalty determination phase of the trial, the jury was to be unanimous in its determination of the elements of the act that caused it to be vile. The trial court denied these motions without comment. After the mistrial was declared, Elliott did not renew any of these motions or otherwise request that the trial court adopt the pre-trial

15

rulings of the first trial and apply them to the conduct of the retrial.

Prior to the retrial, Elliott filed motions seeking disclosure of exculpatory and impeaching information within Rebecca Gragg's initial statement to police and related police reports. Elliott maintained that, as a result of Gragg's testimony during the first trial, he now believed that the Commonwealth was in possession of statements by Gragg or police reports contradicting her testimony. Elliott also sought an in limine ruling from the trial court to permit the introduction at trial of a videotape of Gragg's polygraph examinations. Elliott maintained that the polygraph evidence would show that Gragg had a motive to fabricate a story implicating him when she learned that police knew that she had been untruthful in her prior interviews when she denied any knowledge of or involvement in the murders.

The trial court, by letter to counsel, directed the Commonwealth to disclose to Elliott all statements, whether exculpatory or not, "authored by Rebecca Gragg and furnished to the Office of the Commonwealth's Attorney at some point during the pendency of this prosecution." The record shows that the Commonwealth provided Elliott with additional material not previously provided under a Brady order entered in the first

16

trial, including a forty-eight-page statement "generated by Ms. Gragg." The Commonwealth averred in a cover letter to the packet containing this material that Elliott had thus been "provided . . . with transcripts or summaries of all material contacts between Ms. Gragg and the police concerning this . . . case."

On February 10, 2003, and in anticipation of Elliott's second trial, a hearing was conducted on Elliott's motion to permit the videotape of Gragg's polygraph examinations into evidence. During that hearing, Elliott's counsel asserted that he should be permitted to establish that Gragg had changed her "story" after the police told her that she had "failed" the polygraph examinations. The trial court ruled that during cross-examination of Gragg, Elliott could establish that police had confronted her on May 10, 2001, with the assertion that she had been untruthful in her prior interviews and that is why she had made prior inconsistent statements to the police. The trial court reasoned that Elliott's right to cross-examination could be conducted "without getting into this morass of polygraph, no polygraph, passing, failing and the like."

<u>Guilt Determination Phase</u>

Elliott's second trial commenced on March 24, 2003.[1] During the guilt determination phase of the trial, the Commonwealth presented evidence in accord with the above-recited facts concerning the murders and the subsequent police investigation. During the course of the guilt determination phase, several issues arose which principally relate to the polygraph examinations of Gragg and are the subject of various assignments of error asserted by Elliott in this appeal. For clarity, we will confine our recitation here to the facts relevant to the murders and subsequently recite additional facts where appropriate to address those assignments of error.

Brandon T. Jackson, an employee of the United States Army Intelligence & Security Command at Fort Belvoir, Virginia, had known Elliott since 1991. He testified that on December 26, 2000, Elliott had sent him an e-mail stating that Elliott and some co-workers at Fort Meade wanted to establish a gun range for practice shooting. Jackson recounted that Elliott knew that Jackson had a federal firearms dealer's license, and that Elliott wanted to know if Jackson could acquire gun silencers

---

[1] Elliott has not assigned error to any aspect of the jury selection process. Accordingly, we need not recount the incidents of that portion of the trial.

because these were needed for use at the gun range to avoid complaints from neighbors.

Jackson testified that he ignored the e-mail because he believed Elliott's request was "ludicrous." He explained that gun silencers would never be used for practice shooting because the repeated use of silencers made them less effective at reducing the sound of gunfire. He also testified that obtaining gun silencers legally was a complex process. Several days after sending the e-mail, Elliott telephoned Jackson and asked if he had received the e-mail. He also asked Jackson detailed questions about gun silencers and whether Jackson thought Elliott could purchase a silencer at a gun show.

Gragg testified at length concerning her relationship with Elliott. While not denying her willingness to financially exploit Elliott's attraction to her, she maintained that from the outset she had made it clear to Elliott that she was not seeking a romantic or sexual relationship. Gragg testified, however, that Elliott had once claimed to her that they had sexual intercourse while Gragg had been under the effects of a pre-operative sedative the night before her breast augmentation surgery.

Following this incident, Elliott was "constantly" professing his love to Gragg and provided her with more and more

19

financial support and material goods.  Though continuing to accept these gifts, Gragg became uncomfortable with the relationship and began refusing to see Elliott socially. Elliott then began making excuses to see Gragg allegedly on business related matters and would arrive unannounced at places where he knew Gragg would be.

Elliott had employed a private investigator to aid Gragg in her child custody dispute with Finch.  When the investigator failed to provide Elliott with any useful information, Elliott told Gragg that "he knew people that could do it better." Gragg, who still had romantic feelings for Finch, told Elliott not to interfere.

Eventually, Gragg revealed to Elliott that she had resumed her relationship with Finch and was still in love with him. Elliott then told Gragg that "Jerry" was "checking up" on her so that Elliott could "keep [Gragg] in line."  When Gragg made light of this claim, Elliott grabbed her by the arm and told her that she should take him seriously because "people's lives were in danger."  Elliott also told her that if she went to the police, these people would be killed.  Elliott specifically mentioned Finch as one of the people who would be killed.

In mid-December 2000, Elliott told Gragg that she "had gotten him into this mess," and that she had to help him get out

20

of it.  Elliott said that, if Gragg refused, he did not know what "Jerry" might do.  Elliott gave Gragg personal information about his wife's financial accounts and had her pose as his wife on the telephone to make transfers out of those accounts.  Elliott threw the paper with the information on it away, but Gragg retrieved it and later turned it over to the police.

On December 26, 2000, the same day that Elliott sent the e-mail to Jackson inquiring about obtaining gun silencers, Elliott sent a rambling e-mail to Gragg to "give [her] a little more information concerning a couple of issues that are in the works."  Indicating that he had sent her a carbon copy of his e-mail to Jackson, Elliott further stated that Jackson was "only one of two people that I am working this issue with."  Elliott claimed that the other person, who he identified as "Mac," was "into anything that went bang and he just may have some connections."  Elliott further indicated that he had to meet with "Mac" personally because "[h]e is the type of guy that would bolt if I mentioned any of this in an email."

Throughout the e-mail, as he had in previous communications to Gragg, Elliott made references to having "this one issue resolved" and the possibility of he and Gragg "hav[ing] a relationship when [her] problem [is] taken care of."  Gragg testified that she understood that by the "issue" and the

21

"problem" Elliott was referring to the child custody dispute with Finch. Elliott concluded the e-mail with a postscript telling Gragg to remember that he loved her even "if everything goes south."

After the Commonwealth rested, Elliott recalled Detective Hoffman for the limited purpose of inquiring into one of the issues, previously referenced herein, that had arisen during the Commonwealth's presentation of evidence. Elliott otherwise did not offer any evidence. After being instructed by the trial court and hearing argument from the Commonwealth and the defense, the jury retired to consider its verdicts. During deliberations, the jury sent a question to the trial court asking to view a videotape of the crime scene that had been admitted into evidence. With the concurrence of the parties, the trial court permitted the jury to view the videotape. The record does not reflect that there was any other communication from the jury during this phase of the trial.

After four hours of deliberation, the jury returned its verdicts, convicting Elliott of the capital murder of Thrall, the first degree murder of Finch, and the two related firearm offenses. At the request of the defense, the jury was polled and each juror indicated agreement with the verdicts.

## Penalty Determination Phase

Elliott has not assigned error to the conduct of the evidentiary portion of the penalty determination phase of his trial. Accordingly, we will recount the evidence presented in summary fashion. The Commonwealth called Thrall's mother, brother, and sister-in-law as witnesses to give victim impact testimony. Each recounted the effect of Thrall's murder on her family, including the effect it had on her two sons.

Elliott called his wife and six of his co-workers as character witnesses. Their testimony consisted principally of assertions of Elliott's good character, mild manner, and strong work ethic, including his twenty years enlisted service in the United States Army as a counterintelligence specialist and his subsequent civilian employment in that same capacity.

Elliott's wife testified that they had married in 1976 and that they had a daughter. Elliott also had children from a prior marriage. She admitted that Elliott had not had a close relationship with their daughter. She maintained, however, that he was not a violent person and "would not hurt anybody." On cross-examination, Elliott's wife maintained that she had been unaware of Elliott's relationship with Gragg. Mrs. Elliott also testified that she was unaware until after the murders that

23

Elliott had dissipated about $200,000 of her separate assets during the course of his relationship with Gragg.

The trial court, having ruled that the Commonwealth could not argue Elliott's future dangerousness to society as an aggravating factor supporting the imposition of the death penalty, ruled that the case would be submitted to the jury only on the vileness aggravating factor. During consideration of the jury instructions, Elliott's counsel stated that he agreed with the proposed instruction which, in relevant part, defined the vileness aggravating factor as requiring that the murder of Thrall "was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery of the victim beyond the minimum necessary to accomplish the act of murder."

Elliott did not request an instruction requiring that the jury agree unanimously on the basis for finding the murder to have been vile, as he had requested in his pre-trial motion prior to his first trial. Rather, Elliott's sole assertion at this point was that, "for the record," he objected to the jury being instructed on capital murder because the evidence would not support a finding that the murder of Finch was vile. While conceding that he had no authority other than "a new article [he had] read," Elliott's counsel contended that where the capital

24

murder charge was premised on there having been one or more killings as part of the same transaction, the jury was required to find that all the killings were vile.  The trial court overruled this objection and again asked if Elliott concurred with the instructions.  Elliott's counsel replied, "Yes, other than the objection I've made."

While the jury was deliberating, it sent a question to the trial court asking clarification on where the money to pay a fine imposed on Elliott would come from and "where would the money go."  With concurrence of the parties, the trial court instructed the jury that it was not to concern itself with these matters.  The record does not reflect that there was any other communication from the jury during this phase of the trial.

The jury returned its verdicts, sentencing Elliott to death for the capital murder of Thrall, to life imprisonment for the first degree murder of Finch, and to a total of eight years imprisonment for the two firearm offenses.  At the request of the defense, the jury was polled and each juror indicated agreement with the verdicts.

### Sentencing

After the jury returned its verdict imposing the death sentence, the trial court ordered the preparation of a post-sentence report in accord with Code § 19.2-264.5.  In that

report, Elliott claimed for the first time that his relationship with Gragg had in fact evolved into a sexual, though not necessarily romantic, arrangement. Elliott maintained that he had not disclosed this fact to the police at Gragg's request. Elliott continued to maintain his innocence.

Following preparation of the post-sentence report, the trial court held a sentencing hearing on May 22, 2003. During that proceeding, the trial court overruled several post-verdict motions filed by Elliott. To the extent these motions are pertinent to issues raised in this appeal, we will address their substance within the discussion of the relevant assignments of error. Addressing the trial court prior to the imposition of sentence, Elliott denied any involvement in the murders of Thrall and Finch, asserting that he was the victim of "lies that were told in [the] courtroom" and "a police department that practices Gestapo techniques." The trial court imposed sentence in accord with the jury's verdicts.

We consolidated the automatic review of Elliott's death sentence with his appeal of the capital murder conviction. Code § 17.1-313(F). Elliott's appeal of his non-capital convictions was certified from the Court of Appeals, Code § 17.1-409,

consolidated with his capital murder appeal, and the

consolidated appeals were given priority on our docket.[2]

DISCUSSION

Elliott raises twenty assignments of error with respect to

the conduct of his trial and the imposition of the death

sentence.  The Commonwealth contends that many of Elliott's

assignments of error either were not properly preserved in the

trial court or otherwise have been procedurally defaulted.  We

will address Elliott's assignments of error seriatim,

considering the Commonwealth's assertions of waiver where

relevant.

The "Reasonable Doubt" Jury Question Issue

In preparing for this appeal, Elliott's appellate counsel[3]

discovered in the trial court's manuscript record a handwritten

note, apparently composed by a juror, which reads:

> Can you supply a more simplistic definition of
> reasonable Doubt from a guilt or ~~im~~ (sic) innocence
> point of View?

---

[2] Except to the extent that Elliott asserts that errors in
the general conduct of his trial would require a reversal of all
his convictions, Elliott does not directly challenge his
convictions or sentences for the non-capital crimes.

[3] Elliott's trial counsel had sought to withdraw from
representation following the mistrial of Elliott's first trial.
The trial court denied the motion to withdraw, and trial counsel
represented Elliott pro bono publico during the second trial.
Subsequently, Elliott's appellate counsel were substituted and
served pro bono publico.

27

In his first assignment of error, Elliott contends that the trial court erred in failing to inform his counsel of this jury question. Elliott asks that this Court remand the case to the trial court for an evidentiary hearing "to determine whether the jury asked the reasonable doubt question appearing in the record."

Because the existence of the "reasonable doubt" jury question was not discovered until after the trial court's jurisdiction had expired, no inquiry was made in the trial court as to whether the jury had intended for this question to reach the trial judge. The Commonwealth contends that because the alleged failure of the trial court to inform Elliott of the question was not the subject of any objection in the trial court, the issue cannot be raised for the first time on appeal. Rule 5:25. Elliott responds that "a party can[not] waive an argument before becoming aware of the error."

As we previously noted herein, there is no indication in the record that the trial court received any inquiry from the jury other than the request to view the crime scene videotape during the guilt determination phase and the question concerning the imposition of a fine during the penalty determination phase. Unlike the questions received by the trial court, the "reasonable doubt" jury question contains no response from the

28

trial court.  Beyond these facts, the matter reduces itself to one involving pure speculation, and we decline to speculate whether the jury actually intended to send the purported jury question at issue to the trial court for a response. Accordingly, we will take no further consideration of this issue in this appeal.[4]

### Polygraph Evidence Issues

In his second assignment of error, Elliott asserts that the trial court erred in overruling his motion in limine to have the videotape of Gragg's polygraph examinations admitted into evidence.  Elliott acknowledges that evidence of polygraph examinations is not admissible to show the correctness of the results of such examinations.  Relying on Crumpton v. Commonwealth, 9 Va. App. 131, 384 S.E.2d 339 (1989), he contends that evidence of a polygraph examination may be admissible to explain "the motive for, or context underlying, testimony or statements given by a witness after the witness is told of the results of his polygraph examination."  The Commonwealth responds that Elliott's reliance on Crumpton is misplaced and that the trial court's ruling in this case is in accord with our

---

[4] Moreover, the relief that Elliott seeks, a remand for an evidentiary hearing in the trial court, is not one that may be afforded in a direct appeal.

decision in Robinson v. Commonwealth, 231 Va. 142, 155, 341 S.E.2d 159, 167 (1986), where we held that results of a polygraph examination may not be used to impeach a witness.  We agree with the Commonwealth.

In Crumpton, the Court of Appeals held that a criminal defendant had a right to give a full explanation of his prior inconsistent statements to the police "so long as that explanation did not also necessarily invoke the polygraph examination results as proof that he had been truthful" when he testified.  9 Va. App. at 137, 384 S.E.2d at 343.  The Court in Crumpton emphasized that its holding was based upon "the particular facts and procedural posture" in which the issue arose in that case.  Id., 384 S.E.2d at 342.  Moreover, the Court expressly acknowledged our clear precedent, as expressed in Robinson, 231 Va. at 156, 341 S.E.2d at 167, that the results of polygraph examinations are not admissible whether they favor the accused or are agreed to by both the accused and the Commonwealth.  Crumpton, 9 Va. App. at 135, 384 S.E.2d at 342.

Crumpton is inapplicable to the present case.  It is evident that Elliott sought to impeach Gragg's credibility by the introduction of evidence of Gragg's polygraph examinations as reflected in the videotape of those examinations.  Accordingly, our decision in Robinson is controlling, and we

30

hold that the trial court did not err in denying Elliott's motion in limine to admit into evidence the videotape of Gragg's polygraph examinations.

The remaining polygraph issues raised by Elliott in this appeal arose at trial in the following context. During Elliott's counsel's cross-examination of Detective Hoffman in the guilt determination phase of the trial, the following exchange occurred:

Q. Now there is a gentleman in your police department — and I don't necessarily want you to tell me what he does, but I want to ask you the question. There is a Mr. Meyers; you are familiar with that name?

A. Yes, sir.

Q. He is a person that interviewed Rebecca [Gragg] as well as you; am I right?

A. I believe you're referring to the polygrapher?

Elliott's counsel immediately requested a bench conference. Counsel asserted that he had specifically framed his question so that Detective Hoffman would not identify Meyers as a polygraph examiner. The trial court agreed and asked, "[w]hat if anything do you want to do?" Elliott's counsel asserted that Hoffman had "opened the door and I want to go in it." The trial court reflected that it was "a little dismayed by the answer [Hoffman] gave," excused the jury, and proceeded to question Hoffman.

31

The trial court questioned Detective Hoffman on why he had referred to Meyers as "the polygrapher." Hoffman explained that there were two officers in the police department named Meyers. He conceded upon further questioning, however, that the other officer was a patrolman who had not been involved in the investigation of the Thrall/Finch murders.

Elliott's counsel maintained that because the jurors were now aware that Gragg had taken a polygraph examination, they would naturally assume that she had passed the examination and, thus, tend to find her testimony more credible. The trial court offered to instruct the jury either that it should disregard Detective Hoffman's last answer and/or to specifically instruct the jury that the fact that a witness may have taken a polygraph examination should not lend credence to the witness's testimony. Elliott's counsel indicated that he would prefer that the jury only be instructed to disregard the answer, and that he agreed to this remedy "under protest."

Elliott's counsel then moved for a mistrial, stating that "[i]t was the responsibility on the part of the Commonwealth to inform [Detective Hoffman] not" to make reference to Gragg having taken polygraph examinations. Elliott's counsel further stated that while he did not "know why [Hoffman] did it . . . he has been a police officer long enough to know that he shouldn't

be discussing polygraphs in courtrooms . . . it was intentional in that regard."  The trial court denied the motion for mistrial.  The trial court then instructed Detective Hoffman that he was not to mention the polygraph examinations again. When the jury returned, the trial court instructed the jurors that they "will disregard the last answer given by this witness."

Elliott subsequently filed a post-verdict motion for a new trial, asserting that the jury would have been unable to follow the trial court's instruction and disregard Detective Hoffman's answer indicating that Meyers was a polygraph examiner.  During the sentencing hearing, the trial court expressly found that Hoffman had inadvertently mentioned Meyers' role as a polygraph examiner, and that, without a more definitive assertion that Gragg had undergone polygraph examinations, it would require "an inference upon inference upon inference" for the jury to have concluded that Gragg had passed the examinations.  The trial court denied the motion for a new trial, ruling "that one can assume to the extent that answer has any effect at all, that [the jury] did in fact follow the Court's instructions to" disregard the answer.

In his third assignment of error, Elliott contends that the trial court erred in not permitting him to introduce the results

of Gragg's polygraph examinations to rebut the false impression that Gragg had been truthful in her statements to the police. Elliott contends that the jury would naturally have such an impression from Detective Hoffman's reference to a "polygrapher" having interviewed Gragg. Elliott asserts, as he did at trial, that Hoffman's response "opened the door" to the admission of the results of Gragg's polygraph examinations. We disagree.

The term "opening the door" is a catchphrase often used to refer to the doctrine of curative admissibility. Curative admissibility, in its broadest form, allows a party to introduce otherwise inadmissible evidence when necessary to counter the effect of improper evidence previously admitted by the other party. See Clark v. State, 629 A.2d 1239, 1244-45 (Md. Ct. App. 1993); see also 1 John H. Wigmore, Wigmore on Evidence, § 15 (Rev. ed. 1983). The specific facts of this case do not implicate the application of this doctrine. We are of opinion that the trial court properly exercised its discretion to give a curative instruction to the jury under the circumstances rather than to permit Elliott to introduce otherwise inadmissible and unreliable evidence.

In his fourth and fifth assignments of error, Elliott contends, respectively, that the trial court erred in not granting his motion for mistrial and in not granting his motion

for a new trial on the ground that the curative instruction given by the trial court was not adequate to cure the prejudice caused by Detective Hoffman's testimony.

> A trial court exercises its discretion when it determines whether it should grant a motion for mistrial. Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case. Unless this Court can say that the trial court's resolution of that question was wrong as a matter of law, it will not disturb the trial court's decision on appeal. A judgment will not be reversed for the improper admission of evidence that a court subsequently directs a jury to disregard because juries are presumed to follow prompt, explicit, and curative instructions.

Beavers v. Commonwealth, 245 Va. 268, 280, 427 S.E.2d 411, 420, cert. denied, 510 U.S. 859 (1993) (citations omitted).

As the trial court noted during the sentencing hearing, the oblique reference to a "polygrapher" is not so inherently prejudicial as to require the trial court to grant a mistrial or to set aside the verdict and order a new trial. See Epperly v. Commonwealth, 224 Va. 214, 234, 294 S.E.2d 882, 893-94 (1982) (holding that a witness's mention of the word "polygraph" did not cause harmful error because the reference was elicited "without definition or elaboration"). We hold that in this case the giving of a prompt curative instruction to disregard the reference, which the jury is presumed to have obeyed, was sufficient to avoid any prejudice to Elliott and, thus, the

35

trial court did not abuse its discretion in denying the motions for a mistrial and for a new trial.

## Gragg's Alleged False Testimony

During his cross-examination of Gragg, Elliott's counsel attempted to impeach Gragg by asserting that she had embellished her trial testimony with inculpatory details that had not been included in the interview she gave to police on May 10, 2001. Specifically, Elliott's counsel contended that, in contrast to her trial testimony, she had not told police that Elliott had said during one of the telephone calls after the murders that he was "covered with blood" and that the police were "swarming" around. Gragg testified that while these details were not in the transcript of her interview with the police, she had "told [Detective Hoffman] everything when we were outside" taking a cigarette break and that "when I came back inside they made me — they wrote it down." Under further questioning, Gragg was uncertain whether the police had written the statement containing these additional details for her to sign or whether she had written the statement herself.

Elliott's counsel, noting that such a statement "has not been provided to the Defense," requested that Elliott be provided a copy of this written statement. The Commonwealth's Attorney advised the trial court that he had no knowledge of the

written statement's existence.  As it was late in the day, the trial court called a recess and directed the Commonwealth's Attorney to make inquiries regarding the existence of the written statement.

After the Commonwealth's Attorney and Elliott's counsel jointly interviewed Detective Hoffman, the Commonwealth's Attorney advised the trial court that, according to Hoffman, "no such document was created by him or by anyone . . . he did not have [Gragg] sign anything or read over anything" on May 10, 2001.  Elliott's counsel stated that he wanted "a stipulation from the government that there is no such statement."  The trial court ruled that either the Commonwealth could agree to such a stipulation or Elliott could call Hoffman "to establish that no such statement exists . . . absent the stipulation by the Commonwealth the statement does not exist, you're entitled to prove that it doesn't exist."  The trial court then asked Elliott's counsel, "What else do we need to do?"  Elliott's counsel replied, "Not a thing."

Elliott's counsel then asked the Commonwealth's Attorney whether he would stipulate that the statement did not exist. The Commonwealth's Attorney replied, "We don't know it doesn't exist, we don't have any evidence on it.  You've just got to argue that to the jury that there is no such document."  The

trial court again asked, "Well, what else can we do today?" Elliott's counsel replied, "That's it, your Honor."

When the trial resumed the following morning, Elliott's counsel continued his cross-examination of Gragg. Gragg conceded that she did not mention Elliott saying he was "covered in blood" or that police were "swarming" in either the May 10, 2001 interview or in a written statement she later prepared for the police.[5]

Elliott's counsel then questioned Gragg about the written statement she alleged contained these details, asking her to describe the paper it had been written on and to clarify whether she or Detective Hoffman had written the statement. Gragg testified that she could not recall whether the statement had been written on a pad or on loose paper, but that she believed Hoffman had written the statement and she had read it and signed it. Gragg further testified that when she later asked the Commonwealth's Attorney for a copy of this statement, he told her to ask Detective Hoffman, who "told me that he could not find it."

After Elliott's counsel concluded his cross-examination of Gragg, the trial court called a bench conference and asked the

---

[5] This written statement was the one provided to Elliott during the pre-trial proceedings.

Commonwealth's Attorney if he had any recollection of having been asked by Gragg about the May 10, 2001 written statement or referring her to Detective Hoffman. The Commonwealth's Attorney stated that he had no such recollection.

Elliott's counsel stated that while he was "not suggesting that [the Commonwealth] did anything improper" concerning Gragg's testimony, his "concern is how do we proceed knowing there is no such statement." The trial court again opined that Elliott could call Detective Hoffman to testify that the statement did not exist. Elliott's counsel then stated that he was concerned the Commonwealth might try to rehabilitate Gragg in redirect examination. The trial court then asked whether Elliott's counsel was asserting that "the Commonwealth knows this is . . . perjury." Elliott's counsel responded he was not making that assertion. Although the Commonwealth conducted a brief redirect examination of Gragg, it did not return to the issue of the alleged May 10, 2001 written statement.

After the Commonwealth rested, Elliott recalled Detective Hoffman and asked him whether he had prepared a written statement for Gragg to sign on May 10, 2001. Hoffman testified that neither he nor any other officer prepared a statement for Gragg to sign on that day.

Elliott filed a post-verdict motion for an evidentiary hearing "to determine the factual circumstances surrounding the existence of a written statement allegedly signed by Rebecca Gragg at the behest of the police on May 10, 2001." Elliott contended that either "Gragg lied on the stand in a deliberate attempt to make her story appear more credible and consistent" or "the written statement was signed by her off the record, and the police and/or the Commonwealth lost it or suppressed it." Elliott stated that an evidentiary hearing was necessary because "any possibility of witness perjury or police misconduct must be fully explored."

At the sentencing hearing, the trial court ruled that the matter had been "explored before this jury to the extent . . . that the Defendant saw fit to do so . . . . [T]o conduct an additional hearing at this point on the same issue . . . is not warranted." The trial court denied the motion for an evidentiary hearing in the sentencing order.

In his sixth assignment of error, Elliott contends that "[t]he trial court erred in failing to declare a mistrial based upon the presentation of false testimony by the Commonwealth's witness Rebecca Gragg that she had signed a written statement during an interview with the police on May 10, 2001." In his seventh assignment of error, Elliott contends that "[t]he trial

40

court erred in failing to require the Commonwealth to cure the false testimony by its witness Rebecca Gragg that she had signed a written statement during an interview with the police on May 10, 2001." In briefing these assignments of error, Elliott directs the Court to two points in the trial transcript, asserting that at these points "the trial court failed to declare a mistrial, to require the Commonwealth to take steps to correct the falsehood offered by its star witness, or to otherwise remedy the introduction of this testimony."

The Commonwealth contends that the record does not show that Elliott requested a mistrial or otherwise requested the trial court to "remedy the introduction of this testimony." Accordingly, the Commonwealth asserts that Elliott may not raise these issues for the first time on appeal. Rule 5:25.

In his eighth, ninth, and tenth assignments of error, Elliott contends, respectively, that the trial court erred "in failing to find that the Commonwealth violated its obligation to disclose exculpatory evidence," in failing to grant his post-trial motion for an evidentiary hearing to inquire into the existence of Gragg's alleged written statement, and "in failing to grant a mistrial based upon the Commonwealth's failure to disclose exculpatory evidence." The Commonwealth contends that Elliott, though purporting to relate these assignments of error

41

to the question presented in which he argued his sixth and seventh assignments of error, failed to adequately brief these issues.

We have reviewed the trial transcript at the two points referenced by Elliott with respect to the trial court's failure to grant a mistrial or provide him with some other remedy for Gragg's alleged false testimony.  In addition, we have considered the entire record of Gragg's testimony concerning the statement that she alleged she signed on May 10, 2001 and the various bench conferences related to that testimony.  At no point in the record can we discern where Elliott requested that the trial court declare a mistrial, sought a directive from the trial court requiring the Commonwealth to "cure" Gragg's false testimony, or asked the trial court for any specific remedy.

At best, the record shows that Elliott's counsel asked whether the Commonwealth would stipulate that Gragg had not signed any statement on May 10, 2001.  In response, the trial court opined that in the absence of such a stipulation, Elliott's recourse was to call Detective Hoffman to rebut Gragg's testimony.  In each instance where the trial court offered this opinion, Elliott's counsel did not object or otherwise assert that this course of action was not adequate.  Moreover, Elliott availed himself of that remedy by calling

42

Detective Hoffman as his own witness.  Thus, we agree with the Commonwealth that Elliott did not preserve for appeal in the trial court the issues raised in assignments of error six and seven.

Similarly, we can discern no argument of assignments of error eight, nine, and ten within Elliott's opening appellate brief.  The failure to brief an assignment of error constitutes a waiver of the argument.  See, e.g., Burns v. Commonwealth, 261 Va. 307, 318, 541 S.E.2d 872, 880, cert. denied, 534 U.S. 1043 (2001).  Moreover, as with assignments of error six and seven, there does not appear to be any point in the record were Elliott requested the trial court to rule that the Commonwealth had failed to disclose exculpatory evidence, assuming that Gragg's alleged statement could be considered exculpatory, or sought a mistrial on that ground.  Thus, even if argued on brief, these assignments of error would be barred in any case by the lack of preservation in the trial court.

In his reply brief, Elliott contends that even if he is precluded from raising these issues by his failure to preserve them in the trial court, "the ends of justice would demand that this Court address [these issues] because the false testimony by a government witness strikes at the very heart of the legitimacy of the judicial system."  Even if we were to assume, and indeed

43

there is support in the record for making the contention, that Gragg fabricated her testimony concerning the May 10, 2001 written statement, the record is amply clear that the jury was aware of this possibility. Every instance in which it is possible, or even probable, that a witness has been untruthful with respect to some part of her testimony does not require the declaration of a mistrial, the striking of the witness's testimony, or some other intervention on the part of the trial court. To the contrary, one of the principal duties of a jury as factfinder is to make judgments on the credibility of the witnesses and "[a] factfinder who appreciates a heightened possibility of perjury will respond with heightened scrutiny." Ohler v. United States, 529 U.S. 753, 764 (2000).

Elliott thoroughly cross-examined Gragg about her claim to having signed the May 10, 2001 written statement and called Detective Hoffman to rebut that testimony.[6] The record reflects that in the guilt determination phase of the trial, the question of Gragg's credibility was a central theme of Elliott's closing argument. Moreover, Elliott consistently maintained at trial

---

[6] In his post-trial motion for an evidentiary hearing, Elliott contended that he wanted to question other police detectives who might have knowledge of whether the statement existed. As the trial court indicated in denying that motion, Elliott had ample opportunity to call witnesses at trial.

44

that he did not ascribe any misconduct to the Commonwealth with respect to Gragg's questionable testimony. Under these circumstances, we perceive no reason to invoke the ends of justice exception in order to permit Elliott to raise here issues that were never presented to or ruled on by the trial court.

For these reasons, we hold that Elliott has waived the issues raised in assignments of error six, seven, eight, and ten by failing to preserve those issues in the trial court, and that he has waived the issue raised in assignment of error nine by failing to brief that issue in this appeal.

<u>Exclusion of Evidence of Third Parties'</u>
<u>Animosity Towards Finch</u>

During the trial, Elliott sought to question Gragg about an incident in which Gragg's husband had brandished a gun at Finch. The trial court sustained the Commonwealth's objection, ruling that "unrelated acts of violence would have no bearing on the case . . . I don't see that it's relevant." In his eleventh assignment of error, Elliott contends that the trial court erred in not permitting him to introduce this evidence. Elliott contends that the evidence was relevant to show that Gragg's husband "had as much motivation as [Elliott] to murder Mr. Finch, and the evidence of his prior brandishment of a gun

45

against Mr. Finch shows that he was capable of acting on that motivation."

"Proffered evidence that merely suggests a third party may have committed the crime charged is inadmissible; only when the proffered evidence tends clearly to point to some other person as the guilty party will such proof be admitted. We have stated that a large discretion must and should remain vested in the trial court as to the admission of this class of testimony." Johnson v. Commonwealth, 259 Va. 654, 681, 529 S.E.2d 769, 784, cert. denied, 531 U.S. 981 (2000) (citations and internal quotation marks omitted). As in Johnson, the evidence proffered by Elliott "bore no direct relation to the crimes charged," but tended only to show a prior history of a bad relationship between one of the victims and a third party. Id., 529 S.E.2d at 785; cf. Karnes v. Commonwealth, 125 Va. 758, 766-67, 99 S.E. 562, 565 (1919) (holding evidence of recent death threats by third party admissible). Accordingly, we hold that the trial court did not abuse its discretion in ruling that this evidence was irrelevant and inadmissible.

Elliott also sought to question Detective Hoffman on whether he was aware of an allegation by Finch, found in an affidavit in the record of Gragg's and Finch's custody dispute, that Gragg had induced some acquaintances to assault Finch. The

46

trial court ruled that the statement was inadmissible hearsay. In his twelfth assignment of error, Elliott contends, citing Chambers v. Mississippi, 410 U.S. 284, 302 (1973), that the trial court should not have "applied [the hearsay rule] mechanistically to defeat the ends of justice."  Id.  The Commonwealth responds that Elliott did not argue for a Chambers exception to the hearsay rule in the trial court and, thus, this argument is barred by Rule 5:25.

We need not consider whether Elliott's generalized objection to the trial court's exclusion of this evidence as hearsay was adequate to encompass the argument he now makes on appeal.  Even if the due process argument under Chambers were cognizable on this appeal, unlike the direct or exculpatory proof noted by the United States Supreme Court in that case, here the evidence is too tenuous and speculative to have relevance to prove that Gragg or some other third party acting for her may have committed the murders.  Accordingly, we hold that the trial court properly excluded this evidence.

### Sufficiency of the Evidence

At the conclusion of the Commonwealth's presentation of evidence in the guilt determination phase of the trial, Elliott made a motion to strike the Commonwealth's evidence "to preserve the record."  However, Elliott did not offer any express

47

argument that the Commonwealth had failed to make out a prima facie case for capital murder or the other crimes with which he was charged. The trial court denied the motion to strike the Commonwealth's evidence.

In a post-trial motion for "a new trial," Elliott contended that the evidence was not sufficient beyond a reasonable doubt to prove that he committed the murders.[7] Elliott contended in that motion that the Commonwealth had failed to exclude every reasonable hypothesis of his innocence. Elliott further contended that even if the evidence were sufficient to prove that Elliott committed the murders, the Commonwealth failed to prove that Finch's murder preceded Thrall's murder. Though citing no authority for the proposition, Elliott contended that a capital murder premised upon the "killing of more than one person as a part of the same act or transaction" under Code § 18.2-31(7) required proof that the victim of the capital murder was killed after some other person had been killed. Following argument at the sentencing hearing, the trial court denied this motion without comment.

---

[7] It goes without saying that if the trial court had concurred in Elliott's contention that the evidence had not proven his guilt beyond a reasonable doubt as a matter of law, the relief to which he would have been entitled was the setting aside of the verdicts and a dismissal of the indictments with prejudice, not a new trial.

In his thirteenth assignment of error, Elliott contends that the trial court erred in failing to grant his motion to strike during the guilt determination phase of the trial. In his fourteenth assignment of error, he contends that the trial court erred in failing to grant his "motion to set aside the verdicts for insufficiency of the evidence (denominated a motion for a new trial)." Elliott failed to expressly relate either of these assignments of error to a question presented and in reviewing his questions presented, we do not find any that would incorporate these issues. Moreover, we cannot discern any argument within his brief that expressly addresses these assignments of error. Accordingly, we hold that Elliott has waived these assignments of error.[8] See Burns, supra.

### Vileness Aggravating Factor Issues

In his fifteenth assignment of error, Elliott contends that the trial court erred in overruling his motion to have Virginia's capital murder and death penalty statutes declared unconstitutional "on the ground that the 'vileness' aggravator

---

[8] In any case, when considering challenges to the sufficiency of the evidence in a criminal trial, we will not disturb the factfinder's verdict unless it is plainly wrong or without evidence to support it. Stockton v. Commonwealth, 227 Va. 124, 146, 314 S.E.2d 371, 385, cert. denied, 469 U.S. 873 (1984). The record of Elliott's second trial is adequate to support the jury's verdicts convicting him of the murders of Thrall and Finch and the related firearm offenses.

. . . is unconstitutionally vague on its face and as applied in this case and therefore fails to provide meaningful guidance to the jury."  This contention is an amalgam of three arguments raised by Elliott in the omnibus motion filed prior to his first trial challenging the constitutionality of the capital murder and death penalty statutes.

In his sixteenth assignment of error, Elliott contends that "[t]he trial court erred in failing to instruct the jury on the narrowing construction of the 'vileness' aggravator adopted by this Court."[9]  Although it is not entirely clear from the argument he makes on brief with respect to this assignment of error, it would appear that Elliott is asserting the same argument as was made in one section of the omnibus motion to have the capital murder and death penalty statutes declared unconstitutional filed prior to his first trial.  In any event, we can find nothing in the record of his second trial to suggest

_____

[9] Elliott does not expressly state how the definition of the vileness aggravating factor should have been narrowed or limited in jury instructions.  Presumably, Elliott is contending that the killing of Thrall lacked one or more of the elements tending to show that it involved "torture, depravity of mind or an aggravated battery to the victim."  Elliott provides no authority for his assertion that this Court has "adopted" instructions to this effect, although we have permitted trial courts the discretion to provide further guidance as to the meaning of these terms.  See Jones v. Commonwealth, 228 Va. 427, 446, 323 S.E.2d 554, 564-65 (1984), cert. denied, 472 U.S. 1012 (1985).

50

that he sought an instruction giving a "narrowing construction" of the vileness aggravator.

In his seventeenth assignment of error, Elliott contends that "[t]he trial court erred in denying appellant's motion to instruct the jury to agree unanimously upon a single element of 'vileness.' "  This argument was also raised in the omnibus motion filed prior to Elliott's first trial and in a separate motion filed prior to the first trial seeking a specific jury instruction.  Elliott did not proffer an instruction to this effect during the penalty determination phase of his second trial.

The Commonwealth asserts that because Elliott did not renew the pre-trial motions from his first trial or ask that the trial court adopt its prior rulings on those motions in his second trial, he failed to preserve these issues for appeal.  The Commonwealth further contends that by agreeing to the jury instruction defining the vileness aggravating factor in his second trial and not proffering any alternative instructions, he has waived his claims that the trial court should have given "narrowing construction" and "single element of vileness unanimity" instructions.

In his reply brief, Elliott asserts that he was not required to reassert his pre-trial motions from his first trial

because "the rulings in the first trial automatically carry over to the second one."  For the same reason, Elliott contends that he was not required to proffer his alternative instructions limiting the vileness aggravating factor or requiring a unanimous determination of the elements making the crime vile, because the trial court had ruled on these issues prior to his first trial.

The cases that Elliott relies upon for his assertion that rulings from a mistrial carry over to a subsequent retrial are inapposite and distinguishable.  In Bradley v. Duncan, 315 F.3d 1091 (9th Cir. 2002), the federal Court of Appeals for the Ninth Circuit ruled that where a trial court had determined that an entrapment instruction was required in a trial that ended in a mistrial, the instruction was also required to be given in the subsequent retrial where "no additional evidence to the contrary" rebutted the prior ruling.  Id. at 1098.  Thus, Bradley does not stand for the proposition that all rulings of a trial court in a prior mistrial carry over to a subsequent trial but, rather, that the rationale underlying a particular ruling in the first trial had been correct and should have been applied to identical circumstances in the retrial.

In City of Cleveland v. Cleveland Electric Illuminating Co., 538 F.Supp. 1328 (N.D. Ohio 1981), the trial court did

52

observe that "a mistrial does not affect or invalidate any of the pre-trial proceedings in the case." Id. at 1330. However, that statement is made in an opinion addressing a motion to have the pre-trial rulings from a mistrial adopted in the retrial. Moreover, the rulings at issue were those in orders disposing of discrete claims within a complex litigation, not rulings on issues of law related to matters that would arise during the retrial. In commenting on the rationale of the Cleveland Electric decision, the federal Court of Appeals for the Sixth Circuit has opined that the trial court is not bound in a subsequent trial by the rulings of a prior mistrial, so much as it has the discretion to "recognize and enforce prior rulings . . . but also retains the power to reconsider previously decided issues as they arise in the context of a new trial." United States v. Todd, 920 F.2d 399, 404 (6th Cir. 1990).

We concur in the view expressed by the Commonwealth in the present case that when a criminal case ends in a mistrial, the rulings made by the trial court prior to or during the aborted trial do not automatically carry over to a subsequent retrial. Thus, a defendant may not rely upon objections made at an aborted trial to preserve issues for appeal following his conviction in a subsequent trial. See, e.g., United States v. Palmer, 122 F.3d 215, 221 (5th Cir. 1997) ("objections made at

the aborted trial have no bearing on the retrial, as the two are entirely separate affairs").  Similarly, a defendant may not assert that rulings made on pre-trial motions prior to a mistrial are binding upon the trial court in a subsequent trial unless the trial court adopts those rulings on its own motion or in addressing a motion of one or both of the parties.  See, e.g., United States v. Oakey, 853 F.2d 551, 554 (7th Cir. 1988), cert. denied, 488 U.S. 1033 (1989).  In the absence of a ruling in the second trial adopting the rulings of the aborted trial, the defendant is required to renew his motions with specificity in order to preserve the record of the trial court's rulings and the defendant's objections thereto for any subsequent appeal of the retrial.

Elliott does not assert that the trial court adopted its prior rulings for purposes of his second trial, and we have not been directed to any place in the record where such was done or requested.  Accordingly, we hold that under these circumstances Elliott is barred from raising the issues asserted in this appeal in assignments of error fifteen, sixteen, and seventeen. Additionally, we also agree that Elliott's failure to proffer in his second trial alternative instructions limiting the definition of the vileness aggravating factor or requiring unanimity on the elements of vileness acts as a waiver of the

54

claim that the trial court should have given such instructions to the jury.[10]

## Statutory Review

Elliott's eighteenth and nineteenth assignments of error merely restate the elements of the statutory review of any death sentence mandated by Code § 17.1-313(C).  Accordingly, we will combine the mandatory review of Elliott's death sentence with our discussion of the issues raised by Elliott in his assignments of error.

---

[10] We note further that, as framed within the omnibus pretrial motion challenging the constitutionality of Virginia's capital murder and death penalty statutes, Elliott's contention that the vileness aggravating factor is vague is a reassertion of an argument previously rejected by this Court on numerous occasions.  See, e.g. Wolfe, 265 Va. at 208, 576 S.E.2d at 480 and cases cited therein.  Shortly before Elliott's first trial commenced, the United States Supreme Court released its opinion in Ring v. Arizona, 536 U.S. 584 (2002).  In briefing his argument in this appeal that the vileness aggravating factor is unconstitutionally vague, Elliott for the first time asserts that Ring somehow implicates our prior consideration of this issue.  Elliott's failure to argue the application of Ring in the trial court, despite the fact that nine months elapsed between that opinion's release and the commencement of his second trial, not only constitutes a waiver of that issue on appeal, but demonstrates the necessity of prohibiting a defendant from attempting to rely upon rulings from a prior aborted trial.  In any event, we have already addressed the claim that Ring affects our prior consideration of constitutional issues in death penalty cases and have determined that "nothing . . . in Ring suggests that the Court intended to revisit broader issues of due process protections afforded in the penalty determination phase of all capital murder trials." Powell v. Commonwealth, 267 Va. 107, 137, 590 S.E.2d 537, 555 (2004).

Code § 17.1-313(C)(1) requires that we determine whether the jury imposed the sentence of death under the influence of passion, prejudice, or any other arbitrary factor. Elliott makes no particularized argument that the jury's verdict was not the product of a reasoned and dispassionate deliberation. Nor does our review of the record in this case disclose that the jury failed to give fair consideration to all the evidence both in favor and in mitigation of the death sentence, or was otherwise improperly influenced in favor of imposing the death penalty. Accordingly, we hold that the sentence of death was not imposed under passion, prejudice, or any arbitrary factor.

With respect to the consideration "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," Code § 17.1-313(C)(2), Elliott contends that "[t]he Commonwealth has never imposed such a sentence upon a man with as long and accomplished a record of service to his country as" Elliott. He further contends that "this case lacks the characteristics that normally distinguish the cases in which the death penalty is imposed based upon multiple homicides and vileness from those in which juries choose to impose life imprisonment."

During the penalty determination phase of the trial, the jury heard testimony recounting Elliott's service as a soldier

56

and non-commissioned officer in, and later as a civilian employee of, the United States Army.  The jury also heard evidence throughout the course of the trial that Elliott betrayed his wife of twenty-three years, pursuing a former prostitute and squandering hundreds of thousands of dollars on this illicit relationship.  The evidence showed that Elliott murdered two innocent people in a brutal and premeditated manner, showing no remorse for and purposefully seeking to conceal his crimes.  The murder of Thrall was particularly heinous in that it appears she was a victim of opportunity, killed while her young children were nearby and simply because she was present in the home with Finch or perhaps because she saw and could have identified Elliott.

The jury could reasonably have concluded from Elliott's actions in his secret relationship with Gragg that he had renounced the values he purported to support and follow in his public life.  Faced with the incongruent reality of Elliott's two lives, the jury was well within its province to determine that the mitigating value of Elliott's years of service in the armed forces did not outweigh his culpability for the death of Thrall under the circumstances of that murder.

Because of the statutory directive that we compare this case with "similar cases," we have focused on cases in which an

57

individual was murdered as part of the same act or transaction as another killing and the death penalty was imposed upon a finding of the vileness aggravating factor.  However, our proportionality review includes all capital murder cases presented to this Court for review and is not limited to selected cases.  Even though no two capital murder cases are identical, we are confident that, given the heinousness associated with the murder of Thrall, the sentence of death imposed on Elliott is neither excessive nor disproportionate to sentences generally imposed by other sentencing bodies in this Commonwealth for crimes of a similar nature considering the crime and this defendant.  See, e.g., Hudson v. Commonwealth, 267 Va. 29, 590 S.E.2d 362 (2004); Bailey v. Commonwealth, 259 Va. 723, 529 S.E.2d 570, cert. denied, 531 U.S. 995 (2000); Kasi v. Commonwealth, 256 Va. 407, 508 S.E.2d 57 (1998), cert. denied, 527 U.S. 1038 (1999); Woodfin v. Commonwealth, 236 Va. 89, 372 S.E.2d 377 (1988), cert. denied, 490 U.S. 1009 (1989).

In his twentieth assignment of error, Elliott contends that "[t]he trial court erred in sentencing appellant to death." Elliott purports to relate this assignment of error to the questions presented addressing his challenges to the constitutionality of the vileness aggravating factor and the mandatory review of his death sentence.  Within the sections of

his brief addressing those questions presented, we can discern no particularized argument that the trial court erred in imposing the sentence of death in accord with the jury's verdict.  Thus, we conclude that this assignment of error is merely an assertion of general or cumulative error in the conduct of the trial.  We do not consider such generalized assertions of error.

## CONCLUSION

Having found no error below and perceiving no other reason to commute or set aside the sentence of death, we will affirm the judgment of the trial court.

<u>Affirmed</u>.