COURT OF APPEALS OF VIRGINIA


Present:  Judges Kelsey, McClanahan and Senior Judge Bumgardner
Argued at Alexandria, Virginia


TYRONE TREMAINE SMITH

                                                            OPINION BY
v.      Record No. 0838-05-4                    JUDGE D. ARTHUR KELSEY
                                                            AUGUST 8, 2006
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Thomas D. Horne, Judge

Lorie E. O'Donnell, Public Defender, for appellant.

Michael T. Judge, Assistant Attorney General (Robert F.
McDonnell, Attorney General, on brief), for appellee.


A jury convicted Tyrone Tremaine Smith of second-degree murder, maliciously shooting

into an occupied building, possession of a firearm while in possession of a controlled substance,

and use of a firearm while committing murder.  On appeal, Smith argues that the trial court

abused its discretion by (i) allowing the jury to view the crime scene, (ii) denying his motion for

a mistrial, and (iii) refusing to vacate the jury's sentencing verdicts after he attempted suicide.

Disagreeing with each of these assertions, we affirm.

I.

One evening in March 2003, Smith sold crack cocaine to John Johnson and two of

Johnson's neighbors, Linda and Graham Zimmerman.  Smith had sold crack to the same group

earlier that evening.  Believing the second batch to be of poor quality, Graham Zimmerman

called Smith and demanded his money back.  Smith came back to Zimmerman's apartment, but

refused to give Graham a refund.  After a brief fight, Smith threw down the money and left.

Just after Smith left, Graham Zimmerman went through the house turning off the lights and closing the curtains. While Graham and Linda were looking out the "side of the bedroom window," Graham told her to "go call the police." As Linda turned to step out of the bedroom, she "heard a round of gunfire go off" and then saw Graham "hit the floor." He was later pronounced dead from a fatal gunshot wound to the head.

Smith confessed to the shooting, telling police Graham Zimmerman attacked him with a knife during the fight over the second batch of drugs. Smith said he fired several shots from a parked car outside Zimmerman's apartment in an effort to "scare" him. Smith said he hoped he "hit him," but did not believe he actually did. Smith went to his parents' house later that night and told them he had shot someone. The next day, Smith threw the gun into a pond.

Prior to trial, the Commonwealth filed a motion requesting that the jury be allowed to view the crime scene. There would be no dispute at trial whether Smith shot into the dwelling, the Commonwealth explained. But the layout of the apartment complex, the location of Smith and Graham during the incident, and the distance between the two would be central issues. The view, the Commonwealth contended, was "necessary to explain and clarify the evidence regarding the placement of the defendant, victim, and others before, during, and after" the shooting. Smith objected to the view. Because lighting was "a crucial factor in the case," Smith argued, a view during the daylight hours "would be misleading." The trial judge deferred his ruling on the motion until he heard further evidence at trial.

At trial, the Commonwealth renewed its motion for a jury view after presenting its case. Smith objected, insisting that the photographs and measurements provided the jury with a sufficient understanding of the crime scene. The trial judge granted the Commonwealth's motion, holding that it would aid the jury in evaluating the evidence and would not prejudice Smith. Before leaving for the crime scene, however, the judge ensured that the jurors could

"appreciate the fact that we are not going to this area at night so the lighting conditions would otherwise change by going there in daylight versus going there at nighttime." Each juror was given an aerial photograph of the area that previously had been admitted into evidence. While there, the judge explained, the jurors could walk around the crime scene for a few moments. But they could not speak to each other or go inside the apartment complex.

The bailiffs escorted the jury to the crime scene in one van while the judge, attorneys, court reporter, and Smith traveled there in another van. It was raining when the jury arrived at about 10:04 a.m. Less then ten minutes later, the view ended and everyone returned to the courthouse. Back in the courtroom, the Commonwealth rested its case.

Smith called his girlfriend, Joanna Howland, as a witness. She testified that she drove Smith to the apartment complex and witnessed him hang out of the car window and fire several shots at Graham Zimmerman's apartment. When she drove away, Smith told her that "he hoped that he hit him." Smith later received two phone calls from someone informing him that "the man was dead." Smith "was crying and very upset," Howland testified, because "he didn't mean to hurt him, he was just trying to scare him."

On cross-examination, the Commonwealth asked Howland if she had received any correspondence from Smith about the matter. Howland said she had received several letters from Smith while he was in jail. In these letters, she testified, Smith told her not to testify against him. After this line of questioning, Smith moved for a mistrial. These letters, he argued, should have been turned over by the Commonwealth during pretrial discovery.

The trial judge denied the mistrial motion, but agreed to "instruct the jury to disregard the testimony with respect to any letters that may have been written." Smith responded that "the only fair thing to do" would be for the court to "preclude her, to strike her testimony in its entirety." "I will," the judge responded, "if that's what you want." When the jury returned, the

judge directed them "to totally disregard any testimony" given by Howland in the case. "Can all of you abide by that instruction, put her testimony to one side, disregard it?" the judge asked. He then confirmed the jurors, by nodding their heads, agreed they could disregard the stricken testimony "in its entirety as if it never occurred."

At the conclusion of all the evidence, Smith pled guilty to conspiracy to distribute cocaine. Questioning Smith thoroughly, the trial court found the plea voluntarily and intelligently made. The court then submitted the remaining charges to the jury. After about two hours, the jury returned guilty verdicts on all charges. The court proceeded to the sentencing phase and submitted the case back to the jury. An hour later, the jury informed the court that it had reached its sentencing verdicts.

The bailiffs went to the holding cell to retrieve Smith and found that he had attempted to hang himself. After the court was informed of the situation, the following colloquy took place between Smith's counsel and the trial judge:

| | |
|---|---|
| SMITH'S COUNSEL: | I believe that I would not be doing my job for Mr. Smith if I did not raise obviously the question of his mental status at this time. I bring that to the Court's attention. I don't know - - |
| COURT: | We are going to have Mr. Smith brought out at this time. *We're going to go ahead and finish the jury trial* and I'm going to take some action in this case this afternoon. |
| SMITH'S COUNSEL: | Thank you, sir. |

The bailiffs then brought Smith into the courtroom. His counsel asked for "a moment to spend with Mr. Smith" before the jury returned. The court agreed. Shortly thereafter, the jury reentered the courtroom, announced their sentencing verdicts, and departed after a few brief remarks by the trial judge.

- 4 -

Two months later, Smith filed a motion seeking to vacate the jury sentencing verdicts. Smith argued that the trial court should not have permitted the jury to deliver the sentencing verdicts. Instead, counsel contended, the court should have immediately stopped the proceedings and ordered a competency evaluation of Smith. Although the "only thing that took place was the jury verdict being heard, and certainly he understands what that jury verdict was at this point in time," counsel argued, "we don't know . . . what he was able to comprehend prior to his attempt."

Later, at Smith's request, the trial court ordered a competency evaluation prior to scheduling a final hearing to review the jury's sentencing recommendations. The psychiatrist who evaluated Smith found him fully "competent to be sentenced" and noted that his brief hospitalization was "entirely uneventful." Smith's dangerous behavior, the psychiatrist explained, was not "the product of mental illness but instead is the product of his volition." Better characterized as "manipulative violence," Smith's behavior made him a candidate for "protective" incarceration prior to the final sentencing hearing. "It is likely he will continue to choose to engage in such behavior," the psychiatrist concluded, "in an effort to avoid proceeding to sentencing."

After reviewing the competency evaluation, the trial court denied the motion to vacate and entered the final sentencing order.

II.

A. DAYTIME JURY VIEW — NIGHTTIME CRIME

We begin with Smith's argument that the trial court abused its discretion in granting the Commonwealth's motion for a jury view of the crime scene. This view, Smith argues, added no probative value to the factfinding process and only served to prejudice his defense. We disagree. Code § 19.2-264.1 provides that a jury "in any criminal case may, at the request of the attorney

- 5 -

for the Commonwealth or any defendant, be taken to view the premises or place in question, or any property, matter or thing relating to the case, when it shall appear to the Court that such view is necessary to a just decision."

This statute was "doubtless taken," the Virginia Supreme Court has observed, from an Act of Parliament during the reign of King George IV. Litton v. Commonwealth, 101 Va. 833, 845-47, 44 S.E. 923, 926-27 (1903) (finding the Virginia statute "substantially the same" as 6 Geo. 4, c. 50, § 23). That Act eliminated the common law requirement that the accused consent to the view and authorized nonconsensual views whenever necessary and proper to enhance the jurors' "better understanding" of the evidence, id. at 846, 44 S.E. at 926, and to improve their ability to "apply the testimony" offered at trial, Kearns v. Hall, 197 Va. 736, 741, 91 S.E.2d 648, 651 (1956). See also Culpepper v. Neff, 204 Va. 800, 806, 134 S.E.2d 315, 319-20 (1964).

The decision to grant or deny such a request "lies within the discretion of the trial court." Quesinberry v. Commonwealth, 241 Va. 364, 378, 402 S.E.2d 218, 227 (1991); see also Tross v. Commonwealth, 21 Va. App. 362, 383, 464 S.E.2d 523, 533 (1995). When dealing with discretionary decisions on appeal, only "when reasonable jurists could not differ can we say an abuse of discretion has occurred." Hernandez-Guerrero v. Commonwealth, 46 Va. App. 366, 370, 617 S.E.2d 410, 412 (2005) (citation omitted). That cannot be said here.

The view helped the jury understand the layout of the apartment complex, the location of the window and the parking lot, and how "these factors related to the crimes." See Quesinberry, 241 Va. at 379, 402 S.E.2d at 227. True, the crime occurred at night and the view during the day. But such an obvious difference, capable of being appreciated by any ordinary juror, is not the kind of dissimilarity that could mislead the jurors or cause them to ignore the evidence offered at trial. The aerial photograph, after all, was taken during daylight (not nighttime) hours.

And Smith, unaware of the irony, concedes the photographs admitted into evidence "provided the jury with a fair and accurate depiction of the building."

In any event, exercising commendable caution, the trial judge reminded the jurors the shooting took place at night and confirmed they could keep that in mind during the view. Like the trial judge, we think it entirely fair to assume that the jurors understood and conscientiously obeyed the admonition. We thus reject Smith's argument that the trial court abused its discretion in allowing the jury to view the crime scene.[1]

### B. MOTION FOR A MISTRIAL

Smith next argues the trial court erred in refusing to grant his motion for a mistrial after Joanna Howland testified on cross-examination that she received letters from Smith telling her not to testify against him. Claiming that the Commonwealth should have disclosed these letters before trial, Smith contends that nothing short of a mistrial could have adequately remedied the discovery violation.

We need not decide whether the Commonwealth violated its discovery obligations. Even if it did, the trial court's response to the problem amply protected Smith's right to a fair trial. The trial court, at Smith's request, struck Howland's entire testimony and instructed the jury to not consider any part of it.

As a general rule, criminal judgments will not be reversed for "the improper admission of evidence that a court subsequently directs a jury to disregard because juries are presumed to follow prompt, explicit, and curative instructions." Elliott v. Commonwealth, 267 Va. 396, 418,

---

[1] On appeal, Smith argues that a jury view was also improper due to window drapes present at the time of the shooting, but absent at the time of the view. Smith did not make this argument at trial, however, and cannot do so for the first time on appeal. Under Rule 5A:18, the "same argument must have been raised, with specificity, at trial before it can be considered on appeal." Correll v. Commonwealth, 42 Va. App. 311, 324, 591 S.E.2d 712, 719 (2004); see also Riner v. Commonwealth, 268 Va. 296, 325, 601 S.E.2d 555, 571 (2004).

593 S.E.2d 270, 284 (2004) (citation omitted); see Muhammad v. Commonwealth, 269 Va. 451, 524, 619 S.E.2d 16, 58 (2005) ("A jury is presumed to have followed the instructions of the trial court."); Seaton v. Commonwealth, 42 Va. App. 739, 750, 595 S.E.2d 9, 14 (2004). "Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case," Elliott, 267 Va. at 418, 593 S.E.2d at 284, subject to the most deferential standard of appellate review.

Because the record reveals to us no reason to doubt the efficacy of the trial judge's curative instruction in this case, we reject Smith's argument that only a mistrial could have remedied the claimed discovery violation.

### C. MOTION TO VACATE SENTENCING VERDICTS

Finally, Smith argues that the trial court erred in refusing to vacate the jury sentencing verdicts because his "competency to stand trial during the sentencing phase of the trial was unknown." We again disagree.

The historic "prohibition against trying the incompetent defendant was well established by the time Hale and Blackstone wrote their famous commentaries." Cooper v. Oklahoma, 517 U.S. 348, 356 (1996); see also Godinez v. Moran, 509 U.S. 389, 400 n.11 (1993). Core due process principles forbid it. Drope v. Missouri, 420 U.S. 162, 171 (1975). Absent evidence to the contrary, however, courts presume the competency of an accused to stand trial. The burden of proof rests on the accused (or someone acting on his behalf) to show he "lacks substantial capacity to understand the criminal proceedings" or is "incapable of assisting counsel" in his defense. Orndorff v. Commonwealth, 271 Va. 486, 499-500, 628 S.E.2d 344, 351 (2006). A trial court's competency determination presents a "question of fact that will not be disturbed on appeal unless plainly wrong." Id. at 500, 628 S.E.2d at 351-52.

Mental illness does not necessarily render a defendant incompetent to stand trial. As the Fourth Circuit has explained, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." Walton v. Angelone, 321 F.3d 442, 460 (4th Cir. 2003) (citation omitted). Even a diagnosable psychiatric disorder, like delusional paranoia, does not automatically make a defendant incompetent to stand trial. Bramblett v. Commonwealth, 257 Va. 263, 273, 513 S.E.2d 400, 407 (1999). Whatever his mental state, a defendant remains competent so long as he has a substantial capacity to understand the criminal proceedings and to assist counsel in his defense. Orndorff, 271 Va. at 499-500, 628 S.E.2d at 351-52.

In this case, Smith does not contest his competency to proceed through the guilt phase of his trial. He questions only his competency during the last, few moments of the sentencing phase. After his failed suicide attempt, Smith reasons, the trial court should have "immediately recessed the proceedings" and ordered a mental health evaluation prior to receiving the jury's sentencing verdicts.[2] For a number of reasons, we reject this assertion.

To begin with, Smith never once requested either a recess or a mental health evaluation at any point during the jury trial. Instead, Smith's counsel merely alerted the trial judge to the obvious: that Smith's suicide attempt raised a "question" about his mental status. When the trial judge stated he intended to address the issue after excusing the jury, Smith's counsel said simply,

---

[2] On appeal, Smith's question presented asserts only that his "competency to stand trial during the sentencing phase of the trial was *unknown*." Appellant's Br. at 15 (emphasis added). This argument presents a "procedural competency claim," which must be distinguished from a "substantive competency claim" alleging that the defendant "was, in fact, tried and convicted while mentally incompetent." Walton, 321 F.3d at 459-60; see also United States v. General, 278 F.3d 389, 396 (4th Cir. 2002). A few sentences in Smith's appellate brief, however, appear to go beyond the question presented and affirmatively assert his incompetence. Having carefully reviewed the record, we find no evidentiary support for this assertion.

"thank you." Counsel then asked for, and received, a "moment to spend" with Smith before the jury returned to the courtroom. After consulting with Smith, counsel said nothing further on the subject — a telling omission from the perspective of a trial judge justifiably reluctant to act *sua sponte* and thereby risk overriding defense counsel's tactical decisions.

Even so, Smith argues, the trial court had its own duty to stop the proceedings and order an evaluation without being asked to do either. We agree that a trial court must be alert to circumstances suggesting that a defendant "competent at the commencement of his trial" has somehow later become "unable to meet the standards of competence to stand trial." Drope, 420 U.S. at 181.[3] Thus, a trial court should make itself aware of any "history of irrational behavior," the defendant's "demeanor at and prior to sentencing," and any "prior medical opinions on competency." United States v. General, 278 F.3d 389, 397 (4th Cir. 2002). But we do not agree that a suicide attempt, *without more*, mandates an immediate cessation of trial proceedings so that a mental evaluation can be performed.

Though something the trial court should consider, United States v. Mason, 52 F.3d 1286, 1290 (4th Cir. 1995), a suicide attempt by itself does not necessarily require an immediate competency evaluation, United States v. Davis, 61 F.3d 291, 304 (5th Cir. 1995).[4] Indeed, a

---

[3] Given our ruling, we need not decide whether waiver principles can ever be applied to competency claims on direct appeal — thereby vitiating any *sua sponte* duty of the trial court to order a competency evaluation without being asked to do so. Cf. Pate v. Robinson, 383 U.S. 375, 384 (1966) (stating in *dicta* that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial"), with Burket v. Angelone, 208 F.3d 172, 191 (4th Cir. 2000) (noting that the Virginia Supreme Court, in a state habeas order, held an incompetency claim asserting a *sua sponte* duty to order an evaluation was procedurally defaulted by not being raised in the trial court and on direct appeal).

[4] See also United States v. Messervey, 317 F.3d 457, 463 (5th Cir. 2002) (explaining that Davis held "a suicide attempt during the course of trial, without a previous history of irrational behavior or a medical opinion suggesting incompetence, was insufficiently manifest to make the trial court's failure to *sua sponte* order a mental competency exam an abuse of discretion").

suicide attempt does not unequivocally "demonstrate a failure to understand and appreciate the nature of the proceedings," but may actually be a "quite lucid" — albeit tragic — "reaction to a very chilling situation." Sanchez v. Gilmore, 189 F.3d 619, 623 (7th Cir. 1999) (finding defendant's attempted suicide did not require the trial court to immediately order a competency evaluation); State v. Amaya-Ruiz, 800 P.2d 1260, 1271 (Ariz. 1990) (holding that a suicide attempt, by itself, does not automatically require a competency hearing).[5]

Here, no pretrial evaluations found Smith incompetent to stand trial or likely to become incompetent during trial. The trial lasted four days. The trial judge observed no outbursts or displays of irrational behavior by Smith. On the last day of the trial, Smith entered a guilty plea to the charge alleging a conspiracy to distribute cocaine. At that time, the trial judge conducted an extensive colloquy with Smith concerning the voluntariness and intelligence of his guilty plea. Smith's answers were clear and responsive. Nothing suggested Smith's lucidity had in any way deteriorated or, even less likely, that he was at risk of becoming mentally incompetent.

A few hours later Smith returned to the courtroom after his suicide attempt. Neither the trial judge nor defense counsel noted on the record anything unusual about Smith's countenance or demeanor. Counsel asked for and received a moment to consult with Smith, no doubt in an effort to make her own assessment of his ability to understand what little bit remained of the sentencing proceeding and to assist her to the extent there was anything left to be done in his defense. After speaking directly with Smith, counsel made no request for an immediate cessation of the trial so that a competency evaluation could be performed. Nor did she report to the trial judge any further concerns about Smith's condition. Faced with these circumstances, the

---

[5] Asserting only a constitutional due process challenge, Smith does not contend on appeal that the trial court violated Code § 19.2-169.1 or that any evaluation pursuant to that statute was either requested or performed. We thus express no opinion on the subject.

trial judge reasonably decided not to *sua sponte* stop the proceedings (moments before it would end anyway) so a competency evaluation could be completed.

Smith claims our reasoning puts too much emphasis on his counsel's actions rather than his own. We think the emphasis is entirely fair. Whether the precipitating event is a suicide attempt or some other anomalous event, a trial judge's first instinct should be to determine if defense counsel appears to be aware of the potential problem. Counsel is "obviously in a superior position" to evaluate a client's ability to understand the proceedings. United States v. Caicedo, 937 F.2d 1227, 1233 (7th Cir. 1991) (citation omitted). It naturally follows that counsel's decision not to demand that the trial stop and the defendant be immediately evaluated can be considered "probative of whether *bona fide* doubt" exists as to the defendant's competence to stand trial. Id.; State v. Harris, 859 A.2d 364, 403-04 (N.J. 2004) (finding counsel is "in a far better position than the trial judge to assay the salient facts" concerning a defendant's competency (citation omitted)).

Though performed months later, the competency evaluation of Smith supports the trial judge's decision. The psychiatrist found Smith fully "competent to be sentenced" and said his brief hospitalization was "entirely uneventful" from a psychiatric point of view. Smith's dangerous behavior, the psychiatrist explained, was not "the product of mental illness but instead is the product of his volition." In short, the psychiatrist opined, Smith's behavior (characterized as a form of "manipulative violence") would likely continue "in an effort to avoid proceeding to sentencing."

Under the unique circumstances of this case, we hold the trial court did not err in refusing to vacate the jury's sentencing verdicts and in entering a final judgment in this case.

III.

Because the trial court acted within its discretion in granting a jury view, denying Smith's motion for a mistrial, and refusing to vacate the jury sentencing verdicts, we affirm Smith's convictions.

<u>Affirmed.</u>