UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Chaney, Raphael and Callins
Argued at Richmond, Virginia


MICHAEL LEE VENEY

MEMORANDUM OPINION[*] BY
v.      Record No. 0691-21-2      JUDGE DOMINIQUE A. CALLINS
MARCH 14, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF RICHMOND COUNTY
R. Michael McKenney, Judge

William T. Linka (Richmond Criminal Law, on brief), for appellant.

Victoria Johnson, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury returned verdicts against Michael Lee Veney for second-degree murder, reckless

handling of a firearm, malicious shooting into an occupied vehicle, shooting a firearm from a

vehicle, and use of a firearm in commission of a felony.  Veney contends that the trial court erred in

denying his mistrial motion after the Commonwealth elicited prejudicial testimony from a witness.

He also contends that the evidence is insufficient to support his convictions because the

Commonwealth failed to prove he acted with malice.  For the following reasons, we affirm the

convictions.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413.

BACKGROUND[1]

Early in the morning of July 21, 2018, a driver traveling along Route 3 came upon a red pickup truck stopped in the driver's lane. The driver saw a man exit the stopped truck, then run to, and fall into, a nearby ditch. The driver first attempted to help the man before ultimately calling 911. In response to the 911 call, Deputy Sheriff Charles Bowles arrived on the scene. Deputy Bowles observed that the fallen man showed no sign of life. The man, later identified as Eduardo Jerrell "Jay" Garner, ultimately died from two gunshot wounds to the neck.

As part of his investigation, Deputy Bowles examined the red pickup truck. He noted the driver-side door was left open with the window rolled down and there were several holes in the truck. Deputy Bowles also observed a semiautomatic .25 caliber Beretta lying on the truck's bench seat and a cell phone in the cupholder. The Beretta had one bullet in the chamber and another in the magazine. Lt. Richard A. Conkle, who also observed the scene, later testified that the Beretta, when fired, would have expelled a spent casing from the top of the weapon. The investigating officers did not find any casings in the truck, around the truck, or near the scene. The cell phone in the cupholder was determined to belong to Veney. The truck was registered to Kenneth Veney, Garner's cousin.[2]

The day before, Veney and his friend Reginald Hickman had gone to the Colonial Beach Racetrack in Veney's Chevrolet pickup truck. Because Veney is confined to a wheelchair, the truck was modified to allow Veney to drive, though he still required assistance into the truck. Once Hickman secured Veney in the driver's seat, Veney asked Hickman to bring him the .38 caliber

---

[1] On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth." *Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).

[2] The record also reflects that Kenneth Veney is possibly an unspecified relation to the appellant Veney.

revolver Veney owned. Hickman instead fetched Veney's .25 caliber Beretta and put the .38 caliber revolver in a bank bag in Veney's dresser.

At 10:00 p.m., Veney and Hickman left the racetrack. While driving Hickman home, Veney received a phone call from Garner. Hickman noticed Veney's demeanor change during the call; he also overheard that Veney was supposed to meet Garner somewhere. After ending the call with Garner, Veney pointed his Beretta at Hickman and warned him to stop moving so much. Hickman responded by placing his hands on the dashboard of the truck and telling Veney, "When I get home, you don't have to worry about me getting in your truck no more." Later the same evening, Hickman called Garner, whom he had known his entire life, to arrange for a drug purchase. Hickman was surprised when Veney answered Garner's phone. Garner never appeared for the drug transaction with Hickman.

Damian Towles was a passenger in Garner's vehicle when he saw another vehicle "turn[ ] and d[o] a U-turn at the stop sign" before driving toward Garner's vehicle. Garner first thought the approaching vehicle was "the police" and began driving fast before stopping at a "pole light." Towles, Garner, and a third individual riding with them all jumped out of Garner's vehicle and "ran in the bushes." The men eventually recognized the approaching vehicle as Veney's truck and emerged from the bushes. Garner then got into Veney's front passenger seat, and the pair drove away.

Towles testified that he later went to Veney's home looking for Garner. While parked in front of Veney's home, Towles saw headlights approaching him. He recognized Veney's truck accelerating toward his parked car and feared he would be hit. Towles's passenger jumped out of the car to avoid the apparent collision. Surveillance video shows Veney driving into Towles's car. As Veney's truck turned and attempted to strike the car again, Towles returned to the car and "almost flipped [it]" as he maneuvered to avoid a second collision; then he "shot down the road."

- 3 -

Veney then drove to Willis Veney's home. Veney told Willis that he left Garner in Kilmarnock because Garner was "shooting in the air."[3] He then asked to use Willis's phone and sought to buy a gun. But Willis did not let Veney use his phone and told Veney he did not have a gun to sell.

Trevaughn Veney, Veney's son, testified that Veney returned home at 1:43 a.m., parked diagonally from Trevaughn's bedroom window, and blared his truck horn. Trevaughn walked out to his father's truck and observed that his father was "agitated." Veney asked Trevaughn to retrieve his .38 caliber revolver, a box of ammunition, and his wheelchair charger. Trevaughn collected the items and took them to his father's truck. Veney then left the residence.

Around the same time that morning, Garner called Jason Veney[4] from Veney's phone and asked that Jason pick him up from Kilmarnock and drive him to Veney's house. Jason asked Shawn Sorrell, who was driving Jason's car at the time, to drive to Kilmarnock to collect Garner. Once in the car, Garner explained that he and Veney had argued and that he had Veney's cell phone and gun. Driving along Route 3, the trio saw Veney's truck approaching from the opposite direction. As Veney passed the vehicle, Jason heard a "bang." Sorrell "slammed on the brakes, and [Jason] flew to the dashboard." When Jason turned around to determine what happened, he saw Garner closing the passenger door. Garner then told Sorrell to take him to Kenneth Veney's home instead. There, Garner asked to borrow Kenneth's red truck, and Kenneth obliged. Surveillance video shows Garner, in Kenneth's truck, making a U-turn on Route 3 in front of a store a short

---

[3] The record reflects an unspecified, but apparently distant familial relationship between Willis and the appellant Veney.

[4] Jason is also distantly related to appellant Veney.

- 4 -

distance west of Veney's home at 2:15 a.m.[5]  Two minutes later, at 2:17 a.m., the driver who found Garner can be seen passing the same store.

At 2:27 a.m., Veney returned home.  He again parked his truck outside Trevaughn's bedroom and blew his horn.  Trevaughn came outside, and Veney gave him the .38 caliber revolver and told him to put it in the garage.  Trevaughn took the revolver to the home's detached garage and put it under some couch cushions.  When Trevaughn woke up again later that morning, Veney told him to make sure that the gun was not in the home.  Trevaughn left to run an errand for his father.  While out, he learned of Garner's death.  When Trevaughn returned home, officers were executing a search warrant.  The officers found the .38 caliber revolver where Trevaughn hid it.  The revolver contained five empty shell casings.  Lt. Conkle later testified that the revolver, unlike the Beretta, does not eject shell casings when a bullet is fired.  Instead, the shell casings remain in the revolver until manually extracted.

Veney sat in his truck while officers searched his home.  Lt. Conkle testified that while speaking with Veney, he observed that the bottom of the driver's side window frame of Veney's truck was as tall as Lt. Conkle's shoulder.  The trajectory of the bullets found in Garner's body was "left to right, downward and slightly down toward the back," as though shot from above the victim.

Veney testified on his own behalf.  He explained that he drove to Kilmarnock at Garner's request.  They stopped at a Food Lion, and Garner left the truck to talk on his cell phone.  After about five minutes, Garner returned to the vehicle and requested to go to Walmart.  Veney told Garner to "hurry up, the police [are] going to get us out here."  According to Veney, Garner "tripped out" and accused Veney of calling him a "snitch."  Garner stated, "if I was a snitch, would I do this," then grabbed Veney's Berretta and fired it out of the window.  When they arrived at Walmart,

---

[5] Investigators determined Thomas Store is two tenths of a mile west of Veney's home. The evidence established that a car could travel that distance in seventeen seconds.

- 5 -

Veney heard Garner talking to Towles on the phone. As Garner exited Veney's truck, Veney testified that he heard Garner tell Towles "let's get him tonight." Veney believed that Garner was referring to him, so he left Garner at the store.

Veney acknowledged that after he visited Willis, he returned home and directed Trevaughn to bring him a gun and his wheelchair charger. He testified that he drove around for thirty minutes and eventually saw Garner in Kenneth's red truck. Garner got out of the truck, and Veney pulled next to him to ask Garner to return his phone. Veney said that Garner unexpectedly shot at him, so Veney grabbed his revolver and shot twice. Garner ran back to Kenneth's truck and ducked behind the open door. Garner rose, as if he were going to continue shooting, so Veney shot three more times as he accelerated past Garner. As Veney drove away, he saw Garner stand up and enter the truck. Veney then drove home and told Trevaughn to "take the gun and put [it] in the garage."

At the close of the evidence, Veney renewed his motion to strike. The trial court denied the motion. The jury found Veney guilty of second-degree murder, shooting from an occupied vehicle, maliciously shooting at an occupied vehicle, reckless handling of a firearm, and use of a firearm in the commission of a murder. Veney timely appealed.

ANALYSIS

I. Mistrial Motion

After Willis testified that he did not sell a gun to Veney, the Commonwealth asked Willis about contrary statements he made to the grand jury in the same case. After acknowledging that he had previously testified that he sold a gun to Veney on the night in question, the following exchange occurred:

> Q: Which story is the truth?
> A: This is the truth I'm telling you right now.
> Q: Why didn't you tell the truth to the grand jury?
> A: At the time, I was just scared.
> Q: Who were you scared of?
> A: I was scared of the whole fact, you know, being involved.

Q: Being involved, or were you scared of a person?
A: Scared of — well, scared of a person also.
Q: What person were you scared of?
A: Michael.

Veney's counsel immediately objected and, outside the presence of the jury, argued for a mistrial because the statement was inappropriate. The Commonwealth responded that the statement explained Willis's state of mind. The trial court found that the statement inappropriately prejudiced Veney. But the court denied the motion for a mistrial and instead gave the following instruction to the jury:

> There was an objection made to the testimony of Mr. Willis Veney as to his reason for untruthful testimony before a multijurisdictional grand jury. The Court finds that that testimony was improper. Accordingly, the Court today orders that the question leading to the testimony and the testimony itself be stricken from the record, and you are not to consider it in your decision-making in any way. I would remind you when we began, the Court gave you a preliminary instruction that says you must not consider any evidence which I sustained an objection, or to which I direct you to disregard, or which I've ordered stricken from the record. You are strictly directed in this circumstance to disregard that testimony.

On appeal, we "review[] the denial of a motion for a mistrial under the abuse of discretion standard of review." *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020). "Whether improper evidence is so prejudicial as to require a mistrial is a question of fact to be resolved by the trial court in each particular case." *Fowlkes v. Commonwealth*, 52 Va. App. 241, 248 (2008) (quoting *Beavers v. Commonwealth*, 245 Va. 268, 280 (1993)). On appeal, we only disturb the denial of a motion for a mistrial if there is a manifest probability that the ruling was prejudicial. *Id.* A manifest probability of prejudice arises when the testimony is "so impressive that it probably remained on the minds of the jury and influenced their verdict." *Terry v. Commonwealth*, 5 Va. App. 167, 169 (1987) (quoting *Coffey v. Commonwealth*, 188 Va. 629, 636 (1949)). Moreover, "[a]s a general rule, criminal judgments will not be reversed for 'the

improper admission of evidence that a court subsequently directs a jury to disregard because juries are presumed to follow prompt, explicit, and curative instructions.'" *Smith v. Commonwealth*, 48 Va. App. 521, 531 (2006) (quoting *Elliott v. Commonwealth*, 267 Va. 396, 418 (2004)).

Here, the trial court promptly and explicitly instructed the jury to disregard the objectionable testimony and to not consider it when weighing the evidence. Appellant argues that, once the trial court determined that the testimony was prejudicial, it was compelled to grant the motion for a mistrial. But this is simply not true. If it were, there would be no place for curative instructions. Upon determining that the testimony was prejudicial, a trial court has the discretion to grant a mistrial or issue a curative instruction. *See Lewis v. Commonwealth*, 211 Va. 80, 82-83 (1970). The trial court chose to issue a curative instruction, and we will presume that the jury followed it. *See Smith*, 48 Va. App. at 531.

Veney does not point to any evidence in the record suggesting that the jury failed to follow the cautionary instruction and allowed Willis's testimony to influence its verdicts. Instead, he argues that because the trial court acknowledged the prejudice of the testimony, the acknowledgment alone is sufficient to establish that the prejudice is incurable. Veney cites *Mills v. Commonwealth*, 24 Va. App. 415, 421 (1997), in support of his position. But the facts of that case are readily distinguishable. In *Mills*, a veteran state trooper and the Commonwealth's principal witness improperly testified that during a traffic stop the trooper observed that the appellant had "needle marks on his arm" and offered to show the defense counsel photographs "to prove it." *Id.* at 418. The jury ultimately convicted the appellant of all seven misdemeanor charges, which consisted of traffic infractions, a DUI, and a petit larceny, and imposed a total four-year prison sentence and $8,400 in fines. *Id.* at 419. We could not conclude that the jury's

heavy sentencing recommendations and substantial fine amount were not impacted by the state trooper's impermissible testimony. *Id.* at 421.

Here, the jury did not convict Veney of all the charged offenses. And although Veney suggests that the jury could have found he acted with malice only based on Willis's impermissible testimony, the record does not support that conclusion. The evidence established multiple acts of aggression by Veney from which the jury could have inferred malice. Finally, the challenged testimony did not come from the Commonwealth's principal witness. Willis was only one of multiple witnesses who interacted with Veney that night. And unlike the trooper in *Mills*, Willis is not a law enforcement officer with experience testifying in court or the semblance of expert knowledge. Simply put, the evidence does not suggest that the testimony remained on the minds of the jury and influenced their verdicts. Accordingly, the trial court did not abuse its discretion in denying the motion for a mistrial.

## II. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). An appellate court must ask "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Id.* (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Veney argues that the "evidence was insufficient to convict [him] of any offense which identifies malice as an element of the offense." Accordingly, because malice is not an element of

reckless handling of a firearm, using a firearm in commission of a felony, or shooting from a vehicle, Veney necessarily does not challenge those convictions.[6] *See* Code §§ 18.2-53.1, 18.2-56.1, 18.2-286.1. He only challenges his convictions for second-degree murder and malicious shooting into an occupied vehicle, arguing that there is no evidence he threatened anyone. He testified that he acted in self-defense, which would negate a finding of malice. He contends, "Had the jury not be[en] exposed to the improperly admitted evidence of [him] meeting with Willis, . . . the jury would have had to speculate that [his] acts were done with malice."

"Malice inheres in the 'doing of a wrongful act intentionally, or without just cause or excuse, or as a result of ill will.'" *Tizon v. Commonwealth*, 60 Va. App. 1, 11 (2012) (quoting *Dawkins v. Commonwealth*, 186 Va. 55, 61 (1947)). "[M]alice may be either express or implied by conduct," and it may be implied from the deliberate use of a deadly weapon. *Watson-Scott v. Commonwealth*, 298 Va. 251, 256 (2019) (quoting *Essex v. Commonwealth*, 228 Va. 273, 280 (1984)).

"Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." *Palmer v. Commonwealth*, 71 Va. App. 225, 237 (2019)

---

[6] Veney's second assignment of error specifically questions

> Whether the evidence was sufficient to convict the defendant of the charges of second-degree murder, reckless handling of a firearm, and use of a firearm in the commission of a felony. The defendant further assigns error to the trial court's determination the evidence presented by the Commonwealth was sufficient to survive a motion to strike made during the course of the trial, as well as at the conclusion of the Commonwealth's case in chief.

But his brief includes no arguments addressing the sufficiency of the evidence of the non-malice offenses, so we will not consider them. *See* Rule 5A:20(e); *Cirrito v. Cirrito*, 44 Va. App. 287, 302 n.7 (2004) ("Statements unsupported by argument [or] authority . . . do not permit appellate consideration." (citation omitted)).

(quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). "[C]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). Nor do we consider circumstantial evidence in isolation "because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)).

The evidence proved that in the hours before the fatal shooting, Veney pointed his Beretta at his friend, Hickman, for moving in his truck. Later, Veney drove Garner to the Kilmarnock Walmart and left Garner there. Afterward, he found Towles parked in front of his home. Veney tried to hit Towles with his truck and chased Towles out of the yard. Veney then went to Willis's home and asked Willis to sell him a firearm. When Willis declined, Veney returned home and was "agitated" when he directed his son, Trevaughn, to retrieve his .38 caliber revolver and ammunition. Veney admitted that after he had retrieved his revolver, he encountered Garner driving the red truck on Route 3. Veney admitted that he intentionally fired his revolver several times at Garner before he returned home and instructed Trevaughn to hide the weapon. The jury could have inferred malice from this evidence regarding Veney's conduct. Specifically, the jury could have inferred malice from Veney's aggressive behavior in pointing a gun at Hickman and attempting to hit Towles with his truck. *See Fletcher v. Commonwealth*, 72 Va. App. 493, 507 (2020) ("[m]alice may be inferred from the 'deliberate use of a deadly weapon'" (quoting *Strickler v. Commonwealth*, 241 Va. 482, 495 (1991))); *see also Knight v. Commonwealth*, 61 Va. App. 148, 158 (2012) (considering a car as a deadly weapon).

- 11 -

Although Veney contends that a shootout occurred between himself and Garner, the scene of the homicide does not support his testimony. Investigating officers did not find .25 caliber casings in or around the red truck. The trajectory of Garner's gunshot rounds showed that the bullets entered his neck from the left and traveled downward to the right, suggesting that Garner was shot from an upward angle and was facing his assailant. A reasonable person could conclude that Veney shot Garner from Veney's larger truck, while seated, and that no shootout occurred. Lt. Conkle's testimony proved that Veney's truck was significantly taller than the red truck Garner was driving, further supporting this theory.

"The fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Taylor v. Commonwealth*, 256 Va. 514, 518 (1998)). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). At trial, Veney asserted that he perceived that he was in danger and exercised his right to self-defense. The jury considered Veney's version of the event and rejected it. It was the jury's responsibility to determine his credibility, and it had a right to disregard his self-serving testimony. Because the evidence supports the jury's conclusion that Veney acted maliciously when he shot and killed Garner, we will not reverse their decision.

CONCLUSION

We find that the trial court did not abuse its discretion when it denied Veney's motion for a mistrial. Further, we find that the evidence was sufficient to convict Veney. Accordingly, we affirm the trial court's judgment.

*Affirmed*.