COURT OF APPEALS OF VIRGINIA

Present: Judges O'Brien, Ortiz and Raphael
Argued by videoconference

ANTHONY IVORY COOK, JR.

                                                    MEMORANDUM OPINION* BY
v.       Record No. 0253-22-2                       JUDGE DANIEL E. ORTIZ
                                                    MARCH 21, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HENRICO COUNTY
L.A. Harris, Jr., Judge

Kevin E. Calhoun for appellant.

Leanna C. Minix, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Anthony Ivory Cook, Jr., of second-degree murder and use of a firearm in

the commission of murder. Cook contends that the trial court erred by admitting images of the

victim's medical treatment at the crime scene and by denying his motion for a pre-trial competency

evaluation. He also challenges the trial court's denial of his motion to strike the murder charge,

asserting that his testimony was more credible than that of Commonwealth witness D.S. and that,

based on his testimony, he acted in self-defense or in the heat of passion when he shot the victim.

Because the trial judge acted within sound discretion in admitting images of the crime scene and the

victim and because the trial judge made a proper inquiry necessary to deny a competency

evaluation, we affirm the trial court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413.

BACKGROUND[1]

D.S. and the victim Dwight Hill were engaged and had a child together. D.S. also had a child with Cook. Cook and D.S. shared custody and co-parented their shared child. On the afternoon of January 23, 2021, Cook texted and called D.S. about arranging a weekend visit with their daughter. D.S. told Cook he needed Hill's permission as "the man of th[e] house." Cook retorted that neither Hill nor D.S. could prevent him from visiting his daughter. As D.S. spoke with Cook, Hill took the phone and spoke with Cook. As Hill and Cook conversed, Hill and D.S. left their home and walked down the street to a nearby convenience store. D.S. could not hear the conversation but described Hill's tone of voice as "calm."

When they arrived at the store, D.S. went inside the store and Hill remained outside on the phone. Hill met D.S. inside at the cash register, returned her phone, and immediately exited the store. By the time D.S. left the store, Hill and Cook were down the street, engaged in a "face to face" altercation. As D.S. approached, she heard Cook tell Hill, "Me and your baby mama go way back, and she told me that you were a shit ass n-----." Eventually, the two men parted ways, with Cook walking toward the convenience store on the sidewalk and Hill walking "on the opposite side of the street" in the same direction. As Hill waited for D.S. to catch up with him, Cook turned around "out of the blue" and shot Hill. Hill collapsed and yelled for D.S. to call the police. As Hill lay in the street, Cook approached within six feet of him and "emptied his . . . clip." Cook immediately fled the scene.

---

[1] On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

When the police arrived, Hill was alive but bleeding profusely from his right upper leg. The police saw no weapons on or about Hill. The officers attempted to control the bleeding until EMS personnel arrived and transported Hill to the hospital. The body-worn camera of one of the responding officers depicted the officers and medical responders rendering assistance to Hill as he lay wounded and bleeding in the street. Hill had lost a "significant" amount of blood by the time he reached the hospital. The treating surgeon testified that Hill sustained gunshot wounds to the major femoral artery in his right leg, both lower extremities, the base of his penis, and his right buttocks.[2] The femoral injury was "difficult . . . to control," and Hill died on February 7, 2021. The medical examiner determined that his death resulted from "complications of multiple gunshot wounds to the legs."

When the police processed the crime scene on the night of the shooting, they recovered cartridge casings matching Cook's gun around the pool of blood in the middle of the street, as well as several feet away across the street. Firearm expert Nicole Athey testified that, if the shooter had been standing in the same location when he fired the gun, she would have expected the cartridge casings to land "[i]n the same general area." Athey also testified that the semiautomatic gun used in the shooting "require[d] one pull of the trigger for each shot."

D.S. identified Cook as the shooter, and he was arrested on February 3, 2021. The police advised Cook of his rights under *Miranda v. Arizona*, 284 U.S. 436 (1966), and interviewed him. During the interview, Cook admitted that he shot Hill. Cook also admitted that he fled the scene and disposed of the murder weapon in a sewer drain. After Cook identified the location where he had discarded the gun, the police recovered it. Forensic analysis determined that cartridge casings and bullets recovered from the crime scene had been fired from Cook's gun.

---

[2] The surgeon could not distinguish between entry and exit wounds.

At trial, Cook testified in his own behalf. He maintained that Hill had threatened to "beat [his] ass" during their phone conversation. Cook also stated that "they" told him to come to the convenience store to "get [his] daughter." When Cook arrived, his daughter was not there, and Hill began "getting in [his] face" and warning Cook that he needed Hill's permission to see his daughter. Cook noted that he and Hill "slapp[ed]" their fists into their hands during their altercation.

Cook claimed that Hill began "reaching his shirt up by his waistband like . . . he had a weapon" and repeatedly "walk[ed] up on [him]." Although Cook admitted he "couldn't . . . tell" if Hill had a gun, he was "scared" and, when Hill advanced toward him, Cook "pulled [his] gun out and shot below the waist for [Hill] to get up off [him] and get [out of his] personal space." Despite testifying that he shot Hill in response to Hill "reaching" in his shirt, Cook admitted that he told the police he shot Hill after Hill "kept yapping . . . from behind [him]." Cook admitted that he fired "all five of the shots" without thinking and denied that he intended to kill Hill. Cook also admitted that he fled the scene and disposed of the murder weapon in the sewer.

At the conclusion of the evidence, Cook moved the trial court to reduce the first-degree murder charge to second-degree murder, arguing that the evidence failed to prove premeditation. Citing his own testimony, Cook also asserted that the evidence proved that he shot Hill either in self-defense or in the heat of passion. The Commonwealth opposed the motion to strike, stressing that its evidence proved that Cook had approached and shot an unarmed victim and had continued to shoot "at least four more times" after felling the victim. The trial court denied Cook's motion, ruling that the issue was a factual question to be decided by the jury. The trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and self-defense. After argument by counsel, the jury convicted Cook of second-degree murder and use of a firearm in the commission of a murder. Cook appeals.

ANALYSIS

A.  Admissibility of Medical Assistance Images at Crime Scene

Cook asserts that the trial court erred by "allowing the Commonwealth to introduce pictures and videos of the victim's treatment at the [crime] scene because [their] probative value was significantly outweighed by [the] risk of unfair prejudice."  Cook argues that the graphic nature of the images warranted their exclusion; and because they were presented through the Commonwealth's first witness, the images "predisposed the jury to view the remaining evidence in a distorted and unfavorable way to the [d]efendant."  Cook asserts that other, less inflammatory evidence was available to the Commonwealth that had "the same probative value" as the footage.  He maintains that "the only purpose of introducing the gruesome body-worn camera footage was to shock the jury's conscience so that they [sic] would view the [d]efendant in a negative light."

An appellate court reviews a trial court's decision regarding the admissibility of evidence for abuse of discretion.  *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021).  Although the trial court has discretion, it is not "free to simply act in any way it may deem desirable under the circumstances."  *Id.*  Rather, "the . . . court 'has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'"  *Id.* at 93 (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence."  Va. R. Evid. 2:401.  Even "remote or insignificant" facts are relevant if they "tend[] to establish the probability or improbability of a fact in issue."  *Va. Elec. & Power Co. v. Dungee*, 258 Va. 235, 260 (1999).  But "[r]elevant evidence may be excluded if: (a) the probative value of the evidence

is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact; or (b) the evidence is needlessly cumulative." Va. R. Evid. 2:403. "The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." *Commonwealth v. Proffitt*, 292 Va. 626, 635 (2016) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008)). "The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse." *Spencer v. Commonwealth*, 240 Va. 78, 90 (1990). While "all probative direct evidence generally has a prejudicial effect to the opposing party," the dispositive question is "whether the probative value of the evidence is substantially outweighed by its *unfair* or *unduly* prejudicial effects." *Proffitt,* 292 Va*.* at 635-36 (quoting *Lee v. Spoden*, 290 Va. 235, 251, 252 (2015)). In determining whether evidence is unfairly prejudicial, the trial court considers its tendency "to inflame the passions" of the jury or "to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* at 636 (quoting *Lee*, 290 Va. at 251).

The mere fact that relevant evidence is prejudicial to a defendant is insufficient to exclude it under Virginia Rule of Evidence 2:403; indeed, the Commonwealth's evidence usually is prejudicial to a defendant. *Turner v. Commonwealth*, 65 Va. App. 312, 330 (2015) (observing that "most relevant evidence offered by the Commonwealth in a criminal case is potentially damaging to a defendant"). "If a photograph accurately portrays the scene created by a criminal in the commission of the offense on trial, it is not rendered inadmissible merely because it is 'gruesome' or shocking." *Washington v. Commonwealth*, 228 Va. 535, 551 (1984) (citation omitted).

Even when the cause of death is not in dispute or has been stipulated, crime scene photographs may be admitted. *Orbe v. Commonwealth*, 258 Va. 390, 402 (1999) ("[P]hotographs accurately depict[ing] the crime scene and the victim['s gunshot wound to the

chest] . . . are . . . not rendered inadmissible simply because they may be gruesome or shocking."). Moreover, "[a] defendant's stipulation with regards to the cause of the victim's death does not allow the appellant to sanitize the evidence." *Burnette v. Commonwealth*, 60 Va. App. 462, 485 (2012).

Here, images of Hill immediately after the shooting accurately portrayed the scene and provided evidence of the severity, location, and scope of his wounds, all of which were probative of Cook's state of mind when he shot Hill, and whether he acted with malice. *See Washington*, 228 Va. at 551 (holding that images of a victim in homicide cases "are often relevant to show motive, intent, method, premeditation, and malice, as well as to show the 'degree of atrociousness of the crime'"). The images also assisted the fact finder in determining Hill's location relative to the location of the cartridge casings, and by extension, Cook's location when he fired at Hill. Thus, the very aspects of the video that Cook asserts are prejudicial were, in fact, highly probative of facts at issue in the jury trial. *See* Va. R. Evid. 2:403 (precluding admission of "relevant evidence" if its "probative value . . . is substantially outweighed by . . . the danger of *unfair* prejudice" (emphasis added)). In addition, after viewing the videos, the trial court recognized that whenever someone is shot "there is going to be blood" but determined that "nothing" in the videos "would be . . . so gruesome that it would influence the jury." *See Thomas v. Commonwealth*, 44 Va. App. 741, 758 ("Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences; . . . even then, it becomes a matter of degree."), *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

Based on these circumstances, the trial court was not compelled to conclude that the images of Hill immediately after the shooting substantially and unfairly outweighed their significant probative value. Accordingly, the trial court did not abuse its discretion by admitting the images.

B.  Competency Evaluation

On October 13, 2021, approximately one week before the scheduled jury trial, Cook moved for a mental competency evaluation.  On appeal, he asserts that the trial court erred by denying the motion because the court improperly focused on the timing of the motion rather than whether he "lacked the substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."  Cook stresses that the record established probable cause for a mental competency evaluation based on his defense counsel's proffer that he did not comprehend various aspects of the trial proceedings, Cook's "history of intellectual disability," and responses to the trial court's colloquy.

A trial court "shall order that a competency evaluation" of the defendant be performed by a mental health expert *if* "there is probable cause to believe that the defendant . . . lacks substantial capacity to understand the proceedings against him or to assist his attorney in his own defense."  Code § 19.2-169.1(A).

We review the trial court's probable cause determination for abuse of discretion.  *Dang v. Commonwealth*, 287 Va. 132, 146 (2014).  The trial court abuses its discretion when it fails to consider a "relevant factor" that should have been given "significant weight," considers an "irrelevant or improper factor" and gives it "significant weight," or considers "all proper factors" but makes a "clear error of judgment" when weighing those factors.  *Id.* (quoting *Landrum*, 282 Va. at 352); *see also Clark v. Commonwealth*, 73 Va. App. 695, 705 (2021) (same).  "We can find an abuse of discretion has occurred only when 'reasonable jurists could not differ' as to the proper result."  *Clark*, 73 Va. App. at 705 (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

In determining whether there is probable cause to order a competency evaluation, the trial court may consider "evidence of [the] defendant's irrational behavior, his demeanor at trial, and

any prior medical opinion on competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *Johnson v. Commonwealth*, 53 Va. App. 79, 93 (2008). The trial court should also "'strongly consider' counsel's representations" concerning his client's mental competency "because counsel is in the best position to speak to a client's ability to understand proceedings and assist counsel at trial." *Clark*, 73 Va. App. at 708 (quoting *Johnson*, 53 Va. App. at 94). Nevertheless, "while persuasive, counsel's assertions, 'standing alone, do not typically provide probable cause for an evaluation.'" *Id.* (quoting *Johnson*, 53 Va. App. at 94). The decision to order a competency evaluation is "factually intensive and case specific" because "no fixed or immutable signs . . . indicate the need for further inquiry to determine fitness to proceed." *Johnson*, 53 Va. App. at 92 (quoting *Drope*, 420 U.S. at 180).

Here, defense counsel proffered that he and Cook's family were concerned that Cook did not fully understand the trial proceedings. In support of this, he noted that Cook believed he would receive a lenient sentence, regardless of the verdict. Cook's family informed defense counsel that Cook had "had an Individual Educational Program ("IEP") throughout his school years,"[3] had been under the care of "several psychiatrists and counselors over the years," and "had been diagnosed with mood and/or emotional disorders." In addition, he had received services from both Richmond Behavioral Health Authority ("RBHA") as a juvenile and Dominion Care as an adult. Cook's family also stated that an "aide" assisted Cook with obtaining his driver's license and job applications.[4]

With respect to the trial proceedings, Cook's attorney proffered that "the major things" Cook "misunderstood" were "the different verdicts that the jury could reach in his case" and the

---

[3] Cook was 28 years old at the time of the incident, making any IEP designed at school at least a decade old.

[4] There was no indication that any of his mental health issues were current nor that any treatment received stemmed from a permanent condition.

trial court's "discretion in sentencing him based on those verdicts." Cook "knew the names of his charges and the lesser possible verdicts"; but he could not "explain the elements of those charges and how they differed from one another." Although Cook understood "defense counsel's role," he "had difficulty . . . explaining the roles of the judge, jury, and the prosecutor," as well as "sentencing concepts and the discretionary aspect of the sentencing guidelines." Cook's counsel stated that Cook did not understand that the trial court had the discretion to exceed "the high end of the sentencing guidelines." Defense counsel expressed doubt that Cook "fully understood" his explanation of these concepts and suggested that Cook had previously "downplay[ed] his inability to understand" the information provided to him and believed that Cook's pre-trial time in jail had deteriorated his mental state.

In response to defense counsel's proffer, the trial court questioned Cook about his understanding of the trial process. During that colloquy, Cook agreed that he understood first-degree murder was "premeditated killing," that second-degree murder was an "intentional," but not premeditated killing, and that, absent proof he intentionally killed the victim, he could not be convicted of murder. As for sentencing, the trial court explained that Cook could elect to have the jury or the court sentence him, that the trial court was not bound by the sentencing guidelines, and that, in the event of a first-degree murder conviction, the trial court could impose a life sentence. Cook stated that he understood the trial court's explanations of the potential sentencing outcomes and the jury's role during the guilt phase. Finally, Cook confirmed that he understood he had the right to decide whether to plead guilty or not guilty and that he had "told [his] lawyer everything . . . about the case." The trial court found that Cook understood the proceedings and could assist his attorney in his defense. Accordingly, it held that Cook had failed to establish probable cause for a competency evaluation. We find no error in the trial court's exercise of discretion.

"Mental illness does not necessarily render a defendant incompetent to stand trial." *Smith v. Commonwealth*, 48 Va. App. 521, 532 (2006). "[N]either low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Id.* (quoting *Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003)). "Even a diagnosable psychiatric disorder, like delusional paranoia, does not automatically make a defendant incompetent to stand trial." *Id.* Accordingly, consistent with Code § 19.2-169.1, the controlling standard is that "[w]hatever his mental state, a defendant remains competent so long as he has a substantial capacity to understand the criminal proceedings and to assist counsel in his defense." *Id.* (citing *Orndorff v. Commonwealth*, 271 Va. 486, 499-500 (2006)); *see also Godinez v. Moran*, 509 U.S. 389, 396 (1993) (applying same standard); *Johnson*, 53 Va. App. at 93-99.

Here, the trial court considered defense counsel's concerns about Cook's competency and questioned Cook before ruling on his motion. *Cf. Clark*, 73 Va. App. at 710-11 (holding that the trial court erred when it "explicitly" excluded counsel's proffer from its consideration as a "relevant factor" in determining probable cause for competency evaluation under Code § 19.2-169.1(A)). Defense counsel's statements, "standing alone," did not compel the trial court to find that there was probable cause for a mental competency evaluation. *Johnson*, 53 Va. App. at 94. The trial court responded to defense counsel's concerns by engaging in an extensive colloquy with Cook, addressing each of the issues defense counsel raised. During that colloquy, Cook demonstrated that he understood the distinctions between the possible verdicts, the role of the jury and the judge, and the potential sentencing outcomes.

Moreover, the record demonstrates Cook and his attorney had engaged in vigorous trial preparation for several months, filing a motion for exculpatory medical evidence regarding Hill's condition, a motion *in limine* to preclude admission of images of Hill's medical treatment at the crime scene, and a motion *in limine* to prevent D.S. from testifying to prior bad acts. Cook had

also exchanged discovery with the Commonwealth and had identified twelve potential defense witnesses, including two witnesses whom he identified only a week before filing his competency motion. At the hearing on his competency evaluation motion, Cook's attorney conceded that he had not previously seen any indication that Cook was incompetent, stressing that "at the outset of this case [his mental competence] was okay." Cook's attorney also implicitly conceded that Cook appreciated the potential ramifications of his impending trial, stating that "it's possible . . . his mental health [w]as . . . deteriorating" due to the "seriousness of the charges" and "the stress of an approaching jury trial." Because the trial court properly considered Cook's counsel's motion and reasonably found there was not probable cause to order a competency evaluation, the trial court did not abuse its discretion by denying Cook's motion for a competency evaluation.

### C. Sufficiency of the Evidence

Cook contends that the trial court erred by denying his motion to strike the murder charge because D.S.'s testimony was inherently incredible. He stresses that her testimony conflicted with her statements to the police and that it was uncorroborated. Cook asserts that his testimony, "while not completely unimpeached," was "significantly" more credible than D.S.'s testimony because it was consistent with the account he provided to the police. Based on his testimony, Cook contends that the evidence proved that "he acted in either self-defense or under a heat of passion." Because potential inconsistencies are resolved by the fact finder and because the evidence was not inherently incredible, we disagree.

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009). This Court gives "deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Id.* Thus, this Court must accept "the trial court's determination of the credibility of

- 12 -

witness testimony unless, 'as a matter of law, the testimony is inherently incredible.'" *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006) (quoting *Walker v. Commonwealth*, 258 Va. 54, 71 (1999)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Cook asserts that D.S.'s testimony was not credible because she provided inconsistent accounts "about the direction in which [Hill and Cook] walked after the[ir] argument and where [Cook] fired the first shot." He notes that D.S. gave inconsistent descriptions of her location when Cook opened fire, as well as whether Hill was walking ahead of or behind Cook. Cook also stresses that D.S.'s early accounts to the police conflicted with her trial testimony because she did not tell the police that Cook fired once before approaching Hill and firing several more times.

"Potential inconsistencies in testimony are resolved by the fact finder." *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011). Even assuming that D.S.'s testimony had been partially impeached, however, "the mere fact that a witness' testimony may have been impeached does not necessarily render the testimony inherently incredible." *Ray v. Commonwealth*, 74 Va. App. 291, 306 (2022) (citing *Juniper*, 271 Va. at 415). Indeed, "evidence with some element of untrustworthiness is customary grist for the [fact finder's] mill." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Any impeachment of D.S.'s testimony was "appropriately weighed as part of the entire issue of witness credibility, which is left to the [fact finder] to determine." *Juniper*, 271 Va. at 415 (citing *Shelton v. Mullins*, 207 Va. 17, 22 (1966)). The jury, in its role as fact

finder, was permitted to reject Cook's self-serving testimony that he shot Hill in self-defense or in the heat of passion. *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011).

"When the law says that it is for triers of the facts to judge the credibility of a witness, the issue is not a matter of degree." *Towler*, 59 Va. App. at 291 (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)). "So long as a witness deposes as to facts[,] which, if true, are sufficient to maintain their verdict," and "the trier of the facts sees fit to base the verdict upon that testimony[,] there can be no relief in the appellate court." *Id.* (first alteration in original) (quoting *Swanson*, 8 Va. App. at 379). D.S.'s testimony established that Hill and Cook had separated after their altercation and that Hill was on the other side of the street when Cook suddenly turned and fired, incapacitating Hill. D.S. also testified that Cook approached and continued to fire at Hill as he lay in the street. When the police arrived at the scene, Hill was unarmed. Cartridge casings matching Cook's gun were recovered around the pool of blood in the middle of the street, as well as several feet away across the street, corroborating D.S.'s testimony that Cook first fired at Hill from a distance before approaching and continuing to fire at him as he lay helpless in the road. Athey, a firearm expert, testified that the cartridge casings would land "[i]n the same general area" unless the shooter was moving. She also testified that the semiautomatic gun used in the shooting "require[d] one pull of the trigger for each shot," evidence conflicting with Cook's testimony that he was not thinking when he fired multiple times. After the shooting, Cook fled the scene and hid his gun in a sewer, additional circumstances supporting a finding of guilt. *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018).

Viewed as a whole, the evidence was competent, credible, and sufficient to prove beyond a reasonable doubt that Cook maliciously killed Hill and was therefore guilty of second-degree

murder.  *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016).  Accordingly, the trial court did not err by denying Cook's motion to strike.

CONCLUSION

Because the trial court did not abuse its discretion in denying Cook's motion *in limine*, acted within its discretion in finding there to be no probable cause to order a competency evaluation, and because there was sufficient evidence to support Cook's convictions, the trial court's judgment is affirmed.

*Affirmed.*